UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JUN 07 2021**

| | |
|---|---|
| DOUGLAS F. CARLSON, ) | Civil Action,   JEFFREY P. COLWELL |
| MAYA ZUBKOVSKAYA ) | File No. _____   CLERK |
| Plaintiffs ) | |
| ) | |
| v. ) | COMPLAINT FOR DAMAGES |
| ) | AND SPECIFIC PERFORMANCE |
| COLORADO CENTER FOR ) | |
| REPRODUCTIVE MEDICINE, LLC, ) | |
| FERTILITY LABS OF COLORADO, LLC, ) | |
| ROBERT L. GUSTOFSON, M.D. ) | |
| Defendants ) | |

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs are Douglas F. Carlson and Maya Zubkovskaya.

2. Plaintiffs are citizens of California.

3. Defendants are Colorado Center for Reproductive Medicine, LLC (CCRM), a Delaware LLC, Fertility Labs of Colorado, LLC ("FLC"), a Delaware LLC, and Robert Gustofson, M.D.

4. At the time of the events giving rise to the claims described herein, defendant Gustofson was an employee of CCRM acting within the course and scope of his employment.

5. At the time of the events giving rise to the claims described herein, defendant Gustofson was a physician licensed to practice medicine in Colorado.

6. Defendant Gustofson is a citizen of Colorado.

7. Neither the state of Colorado nor the state of Delaware maintains records indicating the names of the members of CCRM or FLC, nor does either state require CCRM or FLC to provide the names of the members of CCRM or FLC to the state or to the public.

8.   On information and belief, William Schoolcraft, M.D. is a member of CCRM. Dr. Schoolcraft is a citizen of Colorado.

9.   On information and belief, TA Associates Management, a Delaware L.P., is a member of CCRM. The general partner, and only partner, of TA Associates Management L.P. is TA Associates L.P, a Delaware L.P. The general partner, and only partner, of TA Associates, L.P. is TA Associates U.S. Holding Corp., a Delaware corporation with its principal place of business in Boston, Massachusetts. TA Associates U.S. Holding Corp. is a citizen of Delaware and Massachusetts.

10.   In the alternative, on information and belief, TA Associates L.P., a Delaware L.P., is a member of CCRM. The general partner, and only partner, of TA Associates, L.P. is TA Associates U.S. Holding Corp., a Delaware corporation with its principal place of business in Boston, Massachusetts. TA Associates U.S. Holding Corp. is a citizen of Delaware and Massachusetts.

11.   On information and belief, the only member of FLC is CCRM.

12.   Plaintiff Carlson conducted several Internet searches for members of CCRM and FLC but was unable to locate actual or likely members besides the ones named herein on information and belief.

13.   Plaintiff Carlson searched records of this court in PACER to determine whether the members of CCRM or FLC had been revealed in prior cases but was unable to locate the names of members.

14.   Plaintiff Carlson asked Steve Hensen, Esq., who identified himself as counsel for defendants, to provide the names of the members of CCRM and FLC, but Mr. Hensen declined to provide the names.

15.   On information and belief, no other members of CCRM exist.

16.   This court has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

17.   The amount in controversy exceeds $75,000.

18.   The District of Colorado is the proper venue because all defendants reside in this district, a substantial part of the events or omissions giving rise to these claims occurred in this district, and the property that is the subject of this action is located in this district.

**FACTUAL ALLEGATIONS**

19.   Female human fertility declines as a woman ages.  This decline begins at approximately age 32, increases significantly beginning at approximately age 37, and continues to increase sharply after age 40.  By age 45, most women who try to conceive naturally will not conceive naturally.

20.   A chromosomally normal egg is necessary to achieve a healthy pregnancy and a normal, healthy child.

21.   Physicians and other experts believe that the chromosomal quality of a woman's eggs declines with age, and the reduction in the chromosomal quality of eggs is a significant factor in reducing the ability of women to conceive as they age as described in paragraph 19.

22.   Some women who are unable to conceive naturally elect to undergo treatment using an assistive reproductive technology (ART).  One common ART is in-vitro fertilization (IVF).  A

single round of IVF may span two menstrual cycles. The first month, which may be optional for some physicians or patients, is called a priming month. The woman undergoes a blood test at the start of her menstrual cycle. She takes one or more medications at various times during that cycle. After her second menstrual cycle starts, she begins a monitoring process that normally includes several blood tests and ultrasound visualizations to monitor the growth of follicles in her ovaries. Eggs mature in follicles. The second cycle commonly includes pharmaceutical stimulation, often using powerful injectable medications. Eventually, based on multiple blood test results and ultrasound visualizations, the physician usually will advise the woman, at a specific time, to inject a medication to trigger the follicles in her ovaries to mature the eggs. The physician will schedule a surgical procedure, called a retrieval, to insert a needle, guided by ultrasound visualization, to retrieve as many eggs as possible. The IVF physician or clinic will obtain sperm from the woman's male partner or a donor and fertilize the eggs in the laboratory, with the goal of creating embryos.

23.   In some cases, the physician or clinic will transfer some number of embryos into the woman's uterus approximately three days after the retrieval. In some other cases, the physician or clinic will grow the embryos for approximately five days to the blastocyst stage. The physician or clinic may freeze these embryos for transfer into a woman's uterus at a later date. To increase the chance of finding a chromosomally normal egg, a woman may plan to undergo several cycles of IVF to collect as many eggs as possible, and to create as many embryos as possible, freezing the embryos after each cycle.

24.   Before transferring any embryos into a woman's uterus, a physician or clinic may offer or require comprehensive chromosome screening (CCS). CCS attempts to determine whether an

· embryo is chromosomally normal. CCS offers at least two advantages. First, CCS may allow a woman to avoid a pregnancy that could lead to a child with birth defects. Second, although many chromosomally abnormal embryos fail to implant in a woman's uterus, some do implant and then lead to miscarriage, which may cause physical and emotional pain and loss of time. Ideally, CCS would indicate that some embryos are normal, and the physician would transfer one or more of those embryos into the woman's uterus.

25. The CCS process sometimes involves thawing any embryos that were previously frozen, testing them, and then freezing them again while awaiting the CCS results several days later.

26. The CCS process could incorrectly indicate that a chromosomally normal embryo was abnormal (aneuploid).

27. Some physicians believe that a properly identified chromosomal defect could correct itself after the embryo is transferred into a woman's uterus and allowed to develop.

28. Some physicians believe that an embryo that a CCS process indicated was abnormal may result in a healthy baby if the embryo is transferred into a woman's uterus and allowed to develop.

29. For one or more of the reasons described in paragraphs 26, 27, and 28, if a woman's IVF cycles produce only aneuploid embryos, some physicians support or recommend transfer of certain aneuploid embryos into the woman's uterus when the woman has no other practical options to produce a child from her own eggs.

30. Stanford Medicine Fertility and Reproductive Health is conducting a study registered at *www.clinicaltrials.gov* (NCT number NCT04109846) inviting "[p]atients desiring pregnancy

who have no acceptable euploid embryos available for transfer who chose to undergo embryo transfer of a non-euploid embryo (either aneuploid or mosaic)."

31. When a choice exists, physicians, when transferring aneuploid embryos into a woman's uterus, are more likely to recommend transfer of embryos that CCS has indicated have only one defect and embryos for which the identified defect would be unlikely to lead to an actual birth of an abnormal child than they are to recommend transfer of embryos that do not have these characteristics.

32. Some physicians and patients who otherwise might transfer aneuploid embryos into a woman's body will decide not to transfer embryos for which CCS indicates a possibility of an otherwise successful pregnancy that could lead to a live birth of a child with a birth defect.

33. For a woman at plaintiff Zubkovskaya's age, currently 46, the chance of a successful pregnancy from the transfer of an embryo that otherwise would be capable of producing a normal child declines with age due to changes in her body, including but not limited to deterioration of the endometrial lining in the uterus and possible growth of fibroids and polyps that may not be present at the current time but may appear later.

34. Through an ownership, franchise, or other financially beneficial agreement, defendant CCRM offers or advertises IVF services under the CCRM name in nine states and one foreign country. Defendant CCRM actually provides IVF services at its clinic located in Lone Tree, Colorado.

35. Plaintiffs contacted defendants' Lone Tree office in 2018 to request consultations and evaluation for possible IVF treatment.

36. During a telephone consultation between plaintiffs and defendant Gustofson on November 6, 2018, defendant Gustofson informed plaintiffs that the quoted success rate for IVF at plaintiff's age at the time, 44, was approximately 10 percent.

37. Plaintiffs met with defendant Gustofson at defendants' clinic in Lone Tree on December 11, 2018. Defendant Gustofson informed plaintiffs that the pregnancy rate for a patient in plaintiff Zubkovskaya's situation would be 10 to 20 percent per cycle of IVF, and the chance of a successful pregnancy after three cycles of IVF was 25 to 30 percent.

38. The treatment plan that defendant Gustofson developed for plaintiff Zubkovskaya required, for each round of IVF, one month of priming followed by one month of heavy stimulation using injectable and oral medications. The parties also agreed to freeze embryos after fertilization. Defendant Gustofson required plaintiffs to agree to CCS.

39. Plaintiffs and defendants agreed in December 2018 to proceed with IVF treatment.

40. Plaintiffs intended to conduct multiple rounds of IVF.

41. Although defendants offered to conduct ultrasound visualizations and blood tests at defendant's Lone Tree location during the stimulation cycle, defendant permitted plaintiff Zubkovskaya to perform some blood tests and ultrasound visualizations using local providers near her residence in the San Francisco Bay Area, at her own expense.

42. On December 25, 2018, before her priming month began, plaintiff Zubkovskaya sent an e-mail message, Exhibit 1, to Sarah MacLeod, R.N., an employee of defendant CCRM, asking, "As I think ahead to the upcoming treatment, I recognize that the treatment might not produce any embryos that test normal. I understand that CCRM would not transfer any of these

embryos into my body. However, what would my options be for these embryos? Could I have them sent to another clinic for potential transfer if I wished to do so?"

43. On December 26, 2018, Ms. MacLeod responded, "This is definitely a questions [sic] for Dr. G. We have some pretty strict policies about transferring aneuploid embryos, to another clinic, for transfer." *Id.*

44. On December 26, 2018, defendant Gustofson wrote, "I reviewed an email to Sarah about transferring aneuploid embryos to another clinic. Please note that you do have that option, however, once you transfer embryos that are deemed aneuploid to another clinic, you will no longer be eligible for care through CCRM in any method at any point in the future. This policy is very strict and there are no exceptions." *Id.*

45. The date for the first blood test of plaintiff Zubkovskaya's priming month fell on January 1, 2019. Wherever this blood sample is drawn, defendants require the patient to pay for testing of the sample at their laboratory in Colorado. Plaintiffs expended considerable effort to obtain a blood sample on New Year's Day. Plaintiffs stored the sample and shipped it to defendants on January 2, 2019.

46. Plaintiff Zubkovskaya began her priming treatment in early January 2019.

47. On January 15, 2019, plaintiff Carlson began an e-mail conversation with defendant Gustofson to follow up on plaintiff Zubkovskaya's e-mail conversation from December 25 to 26, 2018. Exhibit 2. Plaintiff Carlson asked, "Page 12 of the IVF Consent says that the embryos will be discarded after the 'IVF treatment.' However, we are not sure which moment is the end of the IVF treatment. And if we wanted to retain the possibility of sending abnormal embryos to another clinic, should we sign a different consent document? We have not made any decisions

about this subject, and we hope that we will not need to, but we would like to understand the options now."

48.   On January 16, 2019, defendant Gustofson replied and stated, "Transferring the aneuploid embryos to long term storage or another clinic constitutes preserving the embryos for use in the future and would disqualify you from further care at CCRM." *Id.* 3.

49.   On January 16, 2019, in response to a follow-up question from plaintiff Carlson, defendant Gustofson wrote, "You always have the right to make that decision and transfer your embryos to any location you choose. Equally, we have the right to preserve our own interests and decline further treatment." *Id.* 2.

50.   Defendant Gustofson did not respond to plaintiff Carlson's question on January 15, 2019, whether plaintiffs should sign a different IVF consent document to retain the possibility of sending abnormal embryos to another clinic, rather than either discarding the embryos or allowing them to be used for quality control, training, or research purposes, as the original IVF consent document stated on page 12.

51.   In an e-mail message dated January 16, 2019, defendant Gustofson informed plaintiff Carlson, "Embryos that have been designated for discard if abnormal are usually removed from freezing within 2-3 weeks after the retrieval." *Id.* 3.

52.   Unless patients inquire, defendants do not inform most patients that patients have an "option" to transfer aneuploid embryos to another clinic or a "right" to transfer aneuploid embryos to another clinic or a storage facility.

53.   Plaintiff Zubkovskaya began her stimulation cycle in late January 2019 using injectable and oral medications.

54. On February 7, 2019, four days before plaintiff Zubkovskaya's first surgical egg retrieval procedure, defendants required plaintiffs to sign defendant CCRM and FLC's "In Vitro Fertilization, Embryo Transfer, and Embryo Cryopreservation Informed Consent, Authorization, and Release" ("IVF Consent"), the original version of the document that plaintiff Carlson mentioned to defendant Gustofson on January 15, 2019. The IVF Consent that plaintiff Carlson signed on October 16, 2019, which is identical in all material ways to the IVF Consent that plaintiffs signed on February 7, 2019, appears in Exhibit 3.

55. The IVF Consent stated, in part:

> I/We understand that any unused biological material including follicular fluid, sperm, immature and/or unfertilized eggs, abnormal and/or arrested embryos (those which have stopped developing) will be discarded after the IVF treatment. This material, which would normally be discarded, may be used for training purposes and/or research and will not be used to generate any new embryos or pregnancies. I/We understand that I/we may, at any time, decline donation of or the use of this material, without prejudice.

*Id.* 12.

56. The IVF Consent did not acknowledge defendant Gustofson's representation that patients have an "option" to transfer aneuploid embryos to another clinic or a "right" to transfer aneuploid embryos to another clinic or a storage facility.

57. Already far into treatment, from the two options presented in the IVF Consent, plaintiffs selected the option to discard embryos.

58.   On February 7, 2019, defendants required plaintiffs to sign defendant CCRM and FLC's "Comprehensive Chromosome Screening of Embryo(s) and Embryo(s) Transfer Consent, Acknowledgment and Release" ("CCS Consent").  The CCS Consent that plaintiff Carlson signed, which is identical in all material ways to the CCS Consent that plaintiff Zubkovskaya signed, appears in Exhibit 4.

59.   The CCS Consent stated, in part, "I/We also understand that CCS is an optional procedure and that there are other treatment options which have been explained to me/us." *Id.* 2.

60.   The CCS Consent also stated, in part, "However, CCS remains experimental and there is a possibility that a misdiagnosis of chromosome number or gender could be made; thus, a chromosomally normal embryo could be diagnosed as abnormal, not transferred, and therefore, lower the chance for pregnancy and, conversely, that a chromosomally abnormal embryo could be misdiagnosed as chromosomally normal, be transferred, and could result in miscarriage or an ongoing affected pregnancy." *Id.* 1–2.

61.   The CCS Consent also stated, in part, "Embryos determined to be aneuploid (incorrect number of chromosomes) will be either", and the consent provided two options: "Utilized to facilitate ongoing improvements and advances in CCS or CCRM research[]" or "Discarded in accordance with normal laboratory procedures and applicable laws." *Id.* 2.  Already in treatment, plaintiffs selected the second option.

62.   The CCS Consent did not acknowledge defendant Gustofson's representation that patients have an "option" to transfer aneuploid embryos to another clinic or a "right" to transfer aneuploid embryos to another clinic or a storage facility.

63. The CCS Consent stated, "CCS embryos determined to be abnormal will not be transferred to the uterus, transported to outside IVF laboratories or reanalyzed." *Id.* 2.

64. The CCS Consent did not prohibit plaintiffs from transferring abnormal embryos to a storage facility.

65. Plaintiffs conducted six rounds of IVF. Before the sixth cycle began, the parties agreed to perform CCS on all embryos at the conclusion of that cycle.

66. After frozen embryos were thawed, and by the time of the CCS, defendants identified only three embryos of sufficient quality to test, and defendants tested those three embryos.

67. On February 14, 2020, Ms. MacLeod informed plaintiffs that the CCS indicated that all three embryos were aneuploid. Two of the embryos had multiple defects, and one embryo had only one defect, a missing 9th chromosome.

68. The three aneuploid embryos are plaintiffs' property.

69. Defendants informed plaintiffs in writing on February 14, 2020, that a possibility exists of misdiagnosis from CCS testing due to human or technical error, that the accuracy of CCS testing is 95 to 98 percent, and that a chromosomally normal embryo could be diagnosed as chromosomally abnormal.

70. On February 14, 2020, defendants knew that plaintiff Zubkovskaya may be suffering emotional distress after learning that the test concluded that all three embryos were aneuploid.

71. After defendant CCRM communicated the CCS results to plaintiff Carlson, defendant CCRM's counselor and defendant CCRM committed tortious acts toward plaintiffs on February 14, 2020, that caused both plaintiffs emotional distress and other damages, as well as physical injury to plaintiff Zubkovskaya. The claims resulting from these tortious acts are not included in

this complaint. On February 15, 2020, plaintiffs mailed a letter to defendant CCRM requesting monetary compensation for damages resulting from this incident. On March 2, 2020, defendant denied plaintiffs' request for compensation.

72. In a telephone call on February 24, 2020, defendant Gustofson advised plaintiffs not to proceed with additional cycles of IVF. Plaintiffs did not proceed with any treatment with defendants after this date.

73. On May 5, 2020, Sue McCormick, an employee of defendant CCRM or FLC, contacted plaintiff Zubkovskaya by e-mail regarding the aneuploid embryos and stated, "According to your consent, you have chosen to have your abnormal embryos donated to research."

74. Ms. McCormick's e-mail led to a meeting by telephone with defendant Gustofson on June 3, 2020. Only hours prior to that meeting, and also on June 3, 2020, Ms. MacLeod sent plaintiffs a five-page "Release, Indemnification, and Hold Harmless Agreement for Transfer of Abnormal Embryos" ("Embryo Release #1"). Exhibit 5. The title of the electronic file containing this document was "Abnormal Embryo Transfer Consent final.docx.pdf".

75. Embryo Release #1 included a clause that required plaintiffs, in exchange for "induc[ing] Practice to waive its right to discard or use my/our embryos for testing or quality control purposes, and to transfer these embryos to an independent IVF services provider or storage facility," to agree to provide defendants with "a complete release of any and all known or potential liabilities associated with the IVF services provided by the Practice, including the transfer and use of my/our embryos, and to otherwise indemnify and hold harmless the Practice (and all related entities and parties) from any and all potential claims related to the use of my/our embryos." Id. 1.

76. Embryo Release #1 included a clause that required plaintiffs, in exchange for an "inducement" for defendants CCRM and FLC to allow plaintiffs to transfer the embryos to another clinic or a storage facility, to "release and agree to hold harmless" defendants from "any and all liabilities, claims, actions, damages, and losses of any nature whatsoever (including but not limited to mental suffering, emotional distress, or failure to achieve pregnancy) caused by or arising out of or related to the IVF services provided by the practice and the use of patients' abnormal embryos for reproductive or any other purpose[.]" *Id.* 3.

77. Embryo Release #1 included a clause providing, "Each party hereby irrevocably waives its rights to trial by jury in any action or proceeding arising out of this Agreement or any other agreements the Parties have entered into." *Id.* 4.

78. Embryo Release #1 included a clause providing, "Neither party hereto shall disseminate or release to any third party any information regarding any provision of this Agreement without the written consent of the other party; provided, however, the foregoing shall not apply to information which is required to be disclosed by law." *Id.* 4.

79. Defendant CCRM's Notice of Privacy Practices does not, and at all relevant times did not, impose any restrictions on plaintiffs' disclosure of their protected health information or individually identifiable health information.

80. During the telephone meeting with defendant Gustofson on June 3, 2020, defendant Gustofson attributed the time gap between the CCS results on February 14, 2020, and defendants' first contact with plaintiffs regarding the disposition of the embryos on May 5, 2020, to a desire of defendants to give plaintiffs "space."

81.   During the telephone meeting with defendant Gustofson on June 3, 2020, defendant Gustofson informed plaintiffs that "no problem" existed if plaintiffs wanted to transfer the abnormal embryos to a storage facility.  Plaintiffs and defendant Gustofson discussed the relative merits of two particular storage facilities.  Plaintiff Carlson also informed defendant Gustofson that plaintiffs objected to some terms of Embryo Release #1.  Defendant Gustofson informed plaintiffs that legal counsel and defendants' insurance company dictated the terms of the release.  Plaintiffs understood from defendant Gustofson that the terms were not negotiable.  Plaintiffs and defendant Gustofson agreed that plaintiffs would summarize their concerns by e-mail to facilitate further review.

82.   Plaintiff Carlson sent a letter to defendant Gustofson by e-mail on June 17, 2020.  In the letter, plaintiff Carlson informed defendant Gustofson that plaintiffs objected to the release of liability relating to IVF treatment, the provision requiring plaintiffs to give up a right to a jury trial, and the provision prohibiting plaintiffs from disclosing any information relating to the agreement.

83.   In a telephone conversation on June 24, 2020, Rhonda Bearinger, an employee of defendant CCRM, reminded plaintiff Carlson that plaintiffs had signed the CCS Consent document.  Plaintiff Carlson understood Ms. Bearinger to imply that the CCS Consent stated a CCRM policy against transferring aneuploid embryos to a storage facility and that the CCS Consent indicated plaintiffs' understanding of this policy.

84.   After the telephone conversation on June 24, 2020, Ms. Bearinger sent plaintiffs a revised release ("Embryo Release #2").  Exhibit 6.  The title of the electronic file containing this document was "Abnormal Embryo Transfer Consent (MBH Edits 6.18.20)".  Embryo Release #2

did not include the language in Embryo Release #1 requiring plaintiffs to provide defendants a complete release from "any and all known or potential liabilities associated with the IVF services provided by the Practice[.]" Embryo Release #2 did not include the language in Embryo Release #1 that extended the "release and agree to hold harmless" clause to liabilities, claims, actions, damages, and losses "arising out of or related to the IVF services provided by the practice[.]"

85. When most patients other than plaintiffs seek to transfer their aneuploid embryos to an outside clinic or a storage facility, defendants do not seek to or actually require those patients to provide defendants a complete release from any and all known or potential liabilities associated with the IVF services provided by defendants CCRM and FLC.

86. In the alternative, when most patients seek to transfer their aneuploid embryos to an outside clinic or a storage facility, defendants require those patients to provide defendants a complete release from any and all known or potential liabilities associated with the IVF services provided by defendants CCRM and FLC.

87. When most patients other than plaintiffs seek to transfer their aneuploid embryos to an outside clinic or a storage facility, defendants do not seek to or actually require those patients to release and agree to hold harmless defendants from liabilities, claims, actions, damages, and losses arising out of or related to the IVF services provided by defendants CCRM and FLC.

88. In the alternative, when most patients seek to transfer their aneuploid embryos to an outside clinic or a storage facility, defendants require those patients to release and agree to hold harmless defendants from liabilities, claims, actions, damages, and losses arising out of or related to the IVF services provided by defendants CCRM and FLC.

89. When Ms. Bearinger sent Embryo Release #2 to plaintiff Carlson on June 24, 2020, Ms. Bearinger informed plaintiff Carlson, "As indicated there will be no further changes to this document."

90. On June 24, 2020, plaintiff sent an e-mail message to Ms. Bearinger proposing that the "Waiver of Jury Trial" clause be modified not to include any other agreements into which the parties have entered.

91. On July 6, 2020, Ms. Bearinger sent plaintiff Carlson a revised release ("Embryo Release #3"). Exhibit 7. The title of the electronic file containing this document was "Abnormal Embryo Transfer Consent Final MZ.pdf". In Embryo Release #3, the "Waiver of Jury Trial" clause stated, "Each party hereby irrevocably waives its rights to trial by jury in any action or proceeding arising out of this Agreement." *Id.* 3. The confidentiality clause in Embryo Release #3 was the same as the confidentiality clause in Embryo Release #1 and #2.

92. On August 3, 2020, plaintiff Carlson sent e-mail to Ms. Bearinger explaining plaintiffs' position on the release. Plaintiff Carlson stated, "[W]e will sign this Release if CCRM will remove the confidentiality clause, since this clause is not in our interest, and we do not agree to it."

93. In a telephone conversation with plaintiff Carlson on August 12, 2020, Brittnie Hayes, a representative of defendants' insurance company COPIC, declined to remove the confidentiality clause.

94. On October 22, 2020, plaintiff Carlson sent an e-mail message to Ms. Hayes to explain plaintiffs' position in detail.

95. The version of the confidentiality clause in Embryo Release #1, Embryo Release #2, and Embryo Release #3 would not have allowed plaintiffs to disclose the fact of the transfer of aneuploid embryos from defendant CCRM to a storage facility to other physicians or clinics, relatives, friends, or a possible future child without defendant CCRM or FLC's written consent.

96. On November 3, 2020, Ms. Hayes sent plaintiff Carlson a revised release ("Embryo Release #4"). Exhibit 8. Embryo Release #4 addressed some but not all of plaintiffs' concerns about the confidentiality clause.

97. On November 9, 2020, plaintiff Carlson sent Ms. Hayes an e-mail message expressing continued concerns about the confidentiality clause.

98. On January 4, 2021, Ms. Hayes replied, "CCRM stands behind the proposed Release. We will review any changes you may wish to make to the confidentiality section that remains at issue, but CCRM believes the Release to be in its final version."

99. Embryo Release #1, Embryo Release #2, Embryo Release #3, and Embryo Release #4 include, in their opening paragraph, the following sentence: "Prior to receiving IVF treatment from the Practice, I/we were informed that Practice will not knowingly utilize chromosomally abnormal embryos for reproductive purposes, and I/we explicitly acknowledged and agreed that Practice may, at the Practice's selection, either discard or use chromosomally abnormal embryos for research or quality control purposes." This sentence does not accurately reflect the terms of the IVF Consent or CCS Consent document and does not accurately reflect the terms that defendant Gustofson communicated to plaintiff Zubkovskaya on December 26, 2018, and to plaintiff Carlson on January 15 and 16, 2019.

100. Embryo Release #1, Embryo Release #2, Embryo Release #3, and Embryo Release #4 include the following sentence in their second paragraph: "Despite my/our previously authorizing Practice to discard or use the chromosomally abnormal embryos for research or quality control purposes, I/we am/are now requesting that Practice not discard or use the chromosomally abnormal embryos for research or quality control purposes, and transfer my/our embryos to an independent provider of IVF services or a storage facility." This sentence does not accurately reflect the terms that defendant Gustofson communicated to plaintiff Zubkovskaya on December 26, 2018, and to plaintiff Carlson on January 15 and 16, 2019.

101. Embryo Release #1, Embryo Release #2, Embryo Release #3, and Embryo Release #4 include the following sentence in their third paragraph: "In order to induce Practice to waive its right to discard or use my/our embryos for testing or quality control purposes, and to transfer these embryos to an independent IVF services provider or storage facility, I/we now agree, as described herein, to provide Practice (and all related entities and parties), with a complete release of any and all known or potential liabilities associated with the Practice's transfer and use of my/our embryos, and to otherwise indemnify and hold harmless the Practice (and all related entities and parties) from any and all potential claims related to the use of my/our embryos." This sentence does not accurately reflect the terms that defendant Gustofson communicated to plaintiff Zubkovskaya on December 26, 2018, and to plaintiff Carlson on January 15 and 16, 2019.

102. Embryo Release #1, Embryo Release #2, Embryo Release #3, and Embryo Release #4 include the following sentence in section II: "Practice, at Patients' request, will waive Patients' prior agreement authorizing Practice, at its option, to discard or use for research or quality

control purposes Patients' chromosomally abnormal embryos as indicated in the 'CCS of Embryos and Embryo Transfer' document signed by the Patients and Practice will instead transfer all of Patients' embryos created by the Practice, as of the effective date of this Agreement, to the independent IVF provider selected and identified by the Patients." This sentence does not accurately reflect the terms of the IVF Consent or CCS Consent document and does not accurately reflect the terms that defendant Gustofson communicated to plaintiff Zubkovskaya on December 26, 2018, and to plaintiff Carlson on January 15 and 16, 2019.

103. Plaintiffs have not signed any version of the embryo release.

104. Defendant has not released the embryos to plaintiffs.

105. On March 4, 2021, defendant FLC mailed a bill to plaintiffs for $650 to store the embryos in calendar year 2021.

106. Many health insurance plans do not provide coverage for IVF services.

107. Plaintiffs' health insurance plan does not pay for most services and medications related to IVF treatment.

108. Plaintiffs paid to defendants CCRM and FLC $102,032.55 and incurred additional expenses of more than $40,205.71 for medications and $15,000 for transportation, hotels, and other reasonable and necessary expenses.

## FIRST CLAIM FOR RELIEF

### Breach of Contract — All Defendants

109. Paragraphs 1 to 108 are incorporated herein by reference.

110. A contract existed between plaintiffs and defendants for IVF services.

111. All parties understood and intended that a central purpose of the contract was to produce embryos.

112. At the time that the contract was formed, defendants understood that a possibility existed that embryos that CCS declared to be aneuploid could produce a healthy child.

113. At the time that the contract was formed, defendants knew that the "option" to transfer aneuploid embryos to another clinic and the "right" to transfer aneuploid embryos to another clinic or a storage facility were important to plaintiffs and of potential value to plaintiffs.

114. Defendant Gustofson's representation that patients have an "option" to transfer aneuploid embryos to another clinic and a "right" to transfer aneuploid embryos to another clinic or a storage facility constituted terms of the entire agreement between plaintiffs and defendants.

115. Defendant Gustofson's representation that plaintiffs have an "option" to transfer aneuploid embryos to another clinic and a "right" to transfer aneuploid embryos to another clinic or a storage facility reflected the intent of the parties in forming the contract between plaintiffs and defendants for IVF services.

116. Defendant Gustofson's representation that patients have an "option" to transfer aneuploid embryos to another clinic or a "right" to transfer aneuploid embryos to another clinic or a storage facility did not conflict with the IVF Consent or the CCS Consent for the purpose of the parol evidence rule.

117. Defendants' "policy" to withhold further treatment from plaintiffs "once" they transfer aneuploid embryos to another clinic or to a storage facility constitutes consideration for plaintiffs' exercise of this "right" or "option."

118. Defendants' "policy" to withhold further treatment from plaintiffs "once" they transfer aneuploid embryos to another clinic or to a storage facility constitutes the entirety of the consideration in the contract for plaintiffs' exercise of this "right" or "option."

119. The IVF Consent, the CCS Consent, the Notice of Privacy Practices, and defendant Gustofson's representation that patients have an "option" to transfer aneuploid embryos to another clinic and a "right" to transfer aneuploid embryos to another clinic or a storage facility, comprised the entirety of the agreement between the parties and constituted the terms of the contract that applied to plaintiffs' possible exercise of their "option" or "right" described in this paragraph.

120. When defendant Gustofson did not respond to plaintiff Carlson's question whether plaintiffs should sign a "different consent document" if they "wanted to retain the possibility of sending abnormal embryos to another clinic," paragraph 47, *supra*, defendants denied plaintiffs an opportunity to select the words written in the contract.

121. The IVF Consent and the CCS Consent did not provide informed consent because the documents required plaintiffs to choose between two options for disposition of aneuploid embryos — disposal or donation to quality control, training, or research — when, in fact, defendants' policy allows patients to choose a third option, to transfer aneuploid embryos to another clinic or a storage facility in exchange for defendants' decision to withhold further treatment once patients transfer aneuploid embryos to another clinic or a storage facility.

122. The CCS Consent prohibits transfer of aneuploid embryos to an outside laboratory but does not prohibit plaintiffs from transferring aneuploid embryos to a storage facility or another clinic.

123. When plaintiffs requested to transfer their aneuploid embryos to a storage facility and defendants refused to comply unless plaintiffs agreed to additional terms, defendants failed substantially to perform the contract for IVF services.

124. Plaintiffs substantially performed their obligations under the contract.

125. Defendants breached a contract between plaintiffs and defendants.

126. Plaintiffs suffered economic loss for amounts paid to defendant, to pharmacies, and for transportation, hotels, and other reasonable and necessary expenses.

127. Plaintiffs suffered loss of value and loss of use of the embryos.

128. Plaintiffs suffered emotional distress.

## SECOND CLAIM FOR RELIEF

### Fraud — All Defendants

129. Paragraphs 1 to 108 are incorporated herein by reference.

130. When Ms. McLeod informed plaintiff Zubkovskaya on December 26, 2018, that "We have some pretty strict policies about transferring aneuploid embryos, to another clinic, for transfer[,]" and when defendant Gustofson informed plaintiff Zubkovskaya on December 26, 2018, that plaintiffs would have the "option" to transfer aneuploid embryos to another clinic, and when defendant Gustofson informed plaintiff Carlson on January 16, 2019, that plaintiffs had the "right" to transfer aneuploid embryos to long term storage or another clinic, and when defendant Gustofson informed plaintiffs on December 26, 2018, and January 16, 2019, that they would be disqualified from further treatment from defendants once plaintiffs transferred embryos to another clinic or storage facility, defendants knew that, if plaintiffs exercised this "option" or "right," defendants would demand that plaintiffs agree to terms that defendants were not

disclosing to plaintiffs prior to signing the IVF Consent and CCS Consent and that did not appear in the IVF Consent, CCS Consent, or Notice of Privacy Practices.

131. When plaintiffs signed the IVF Consent and the CCS Consent, defendants knew that defendants would not allow plaintiffs to transfer aneuploid embryos to a storage facility unless plaintiffs agreed to terms that defendants were not disclosing to plaintiffs prior to signing the IVF Consent and the CCS Consent.

132. When plaintiffs signed the IVF Consent and the CCS Consent, defendants knew that the two options presented to plaintiffs in those documents for disposition of aneuploid embryos were not the only two options available to plaintiffs.

133. Defendants' representation that disqualification from future treatment from defendants was the only consideration required of plaintiffs if they elected to transfer aneuploid embryos to another clinic or a storage facility was false.

134. The CCS Consent falsely represented that defendants would not prohibit plaintiffs from transferring aneuploid embryos to a storage facility or another clinic.

135. Defendants knew that the "option" to transfer aneuploid embryos to another clinic and the "right" to transfer aneuploid embryos to another clinic or a storage facility were important to plaintiffs and of potential value to plaintiffs. Therefore, this "option" and this "right" were material.

136. Defendants knew and intended that plaintiffs would rely on defendant Gustofson's representation of the existence of the "option" to transfer aneuploid embryos to another clinic and the "right" to transfer aneuploid embryos to another clinic or a storage facility.

137. In deciding to continue treatment with defendants, plaintiffs relied on defendant Gustofson's representation of the existence of the "option" to transfer aneuploid embryos to another clinic and the "right" to transfer aneuploid embryos to another clinic or a storage facility.

138. In deciding to continue treatment, plaintiffs justifiably relied on a statement of clinic policy that their treating physician provided. Plaintiffs' reliance was justified in general and also because Ms. MacLeod referred plaintiff Zubkovskaya's question to defendant Gustofson on December 26, 2018, to explain the "policies."

139. At the time of the formation of the contract, defendants concealed from or failed to disclose to plaintiffs the material fact that, if plaintiffs sought to transfer aneuploid embryos to another clinic or storage facility, defendant would require plaintiffs to agree to terms that defendants were not disclosing to plaintiffs prior to signing the IVF Consent and CCS Consent and that did not appear in the IVF Consent, CCS Consent, or Notice of Privacy Practices.

140. Defendants concealed or failed to disclose the material fact described in paragraph 139 with the intent of creating a false impression of the actual facts in plaintiffs' minds.

141. When defendants concealed or failed to disclose the material fact described in paragraph 139, defendants knew or should have known that plaintiffs might not agree to those terms.

142. When defendants provided Embryo Release #1 to plaintiffs, or when plaintiffs complained about the terms of Embryo Release #1 to defendant Gustofson on June 3, 2020, *see* paragraph 81, *supra,* and defendant Gustofson responded to plaintiffs that legal counsel and the insurance company required the terms contained in the release, defendants intentionally and with malice sought to deprive plaintiffs of the right to file against defendants an actual or potential

legal claim known to defendants, *see* paragraph 68, *supra,* that was unrelated to the transfer of aneuploid embryos.

143. Defendants' numerous assertions, *see* paragraphs 89, 93, 96, and 98, *supra,* that defendant would not modify the Embryo Release documents reflected a malicious intent to deprive plaintiffs of rights that, in the absence of those provisions, they otherwise would enjoy.

144. Defendant's attempts in the Embryo Release documents, despite plaintiffs' objections to some terms specified in the Embryo Release documents, to deprive plaintiffs of rights that, in the absence of those provisions, they would enjoy, while defendant knew that it did not have the right to withhold plaintiffs' embryos as it demanded that plaintiffs agree to the terms specified in the Embryo Release documents, reflected a malicious intent to perpetrate the fraud that began when defendants falsely represented, or concealed, or failed to disclose material facts relating to the "option" to transfer aneuploid embryos to another clinic and the "right" to transfer aneuploid embryos to another clinic or a storage facility.

145. The versions of the Embryo Release documents display fraudulent intent when they recite purported prior agreements between the parties that defendants CCRM and FLC were agreeing to waive as consideration if plaintiffs released defendants CCRM and FLC from various potential claims and liabilities because the prior agreements recited in the documents conflict with the representations that defendant Gustofson made to plaintiffs as treatment was beginning and, as alleged in paragraphs 99 and 102, do not match the terms in the documents that plaintiffs signed previously.

146. Plaintiffs suffered economic loss for amounts paid to defendant, to pharmacies, and for transportation, hotels, and other reasonable and necessary expenses.

147. Plaintiffs suffered loss of value and loss of use of the embryos.

148. Plaintiffs suffered emotional distress.

## THIRD CLAIM FOR RELIEF

### Colorado Consumer Protection Act — All Defendants

149. Paragraphs 1 to 108 are incorporated herein by reference.

150. Defendants knowingly or recklessly made a false representation of the characteristics of their IVF services when defendant Gustofson informed plaintiff Zubkovskaya on December 26, 2018, that plaintiffs would have the "option" to transfer aneuploid embryos to another clinic, when defendant Gustofson informed plaintiff Carlson on January 16, 2019, that plaintiffs had the "right" to transfer aneuploid embryos to long term storage or another clinic, and when defendant Gustofson informed plaintiffs on December 26, 2018, and January 16, 2019, that they would be disqualified from further treatment from defendants once they transferred embryos to another clinic or storage facility, and defendants failed to disclose that defendants would demand that plaintiffs agree to terms that defendants were not disclosing to plaintiffs prior to signing the IVF Consent and CCS Consent, that did not appear in the IVF Consent, CCS Consent, and Notice of Privacy Practices, and that, in some cases, were unrelated to aneuploid embryos.

151. Defendants knowingly or recklessly made a false representation of the characteristics of their IVF services when they provided plaintiffs only two options in the IVF Consent and CCS Consent for disposition of aneuploid embryos — discard or donate to quality control, training, or research — when defendants knew that a third option existed, to transfer aneuploid embryos to an outside clinic or a storage facility.

152. Defendants knowingly or recklessly made a false representation of the characteristics of their IVF services when they provided plaintiffs only two options for disposition of aneuploid embryos — discard or donate to quality control, training, or research — in the IVF Consent document and titled this document, in part, "informed consent."

153. In the alternative, defendant Gustofson falsely represented the characteristics of defendants' IVF services in his e-mail messages on December 26, 2018, January 15, 2019, and January 16, 2019.

154. When defendant Gustofson informed plaintiff Zubkovskaya on December 26, 2018, that plaintiffs would have the "option" to transfer aneuploid embryos to another clinic, and when defendant Gustofson informed plaintiff Carlson on January 16, 2019, that plaintiffs had the "right" to transfer aneuploid embryos to long term storage or another clinic, and when defendant Gustofson informed plaintiffs on December 26, 2018, and January 16, 2019, that they would be disqualified from further treatment from defendants once they transferred embryos to another clinic or storage facility, defendants did not, at the time that defendant Gustofson wrote those statements, intend to provide the "option" and "right" discussed in this paragraph without later demanding that plaintiffs agree to terms that defendants were not disclosing to plaintiffs prior to signing the IVF Consent and CCS Consent and that did not appear in the IVF Consent, CCS Consent, or Notice of Privacy Practices.

155. Defendants' false representations described in paragraphs 150–153, *supra,* constitute a deceptive trade practice.

156. Considered together, defendant Gustofson's e-mail messages, the IVF Consent, and the CCS Consent constitute deceptive trade practices because they are unfair, unconscionable,

deceptive, deliberately misleading, false, and fraudulent within the meaning of C.R.S.

§ 6-1-105(1)(kkk), and defendants' practices relating thereto were knowing or reckless.

157. Defendants' attempt to require plaintiffs to agree to a confidentiality clause in order to receive their embryos is unfair and unconscionable because this confidentiality clause conflicts with public policy and applicable law. The Health Insurance Portability and Accountability Act (HIPAA) provides individual patients, not physicians, hospitals, or clinics, control over the disclosure of their protected health information. *See* 45 C.F.R. Part 164, Subpart E. Under HIPAA and defendant CCRM's Notice of Privacy Practices, once individuals possess their protected health information, they have the right to disclose their protected health information whenever and however they wish. Defendants' confidentiality clauses in the Embryo Release documents attempt to wrest control over disclosure of protected health information away from plaintiffs, contrary to public policy and HIPAA. Defendants' refusal to provide the embryos to plaintiffs unless they sign a confidentiality clause in an Embryo Release document is unfair and unconscionable.

158. Defendants' conduct after plaintiffs asked to transfer their embryos to a storage facility constituted a deceptive trade practice because it was unfair, unconscionable, deliberately misleading, and fraudulent within the meaning of C.R.S. § 6-1-105(1)(kkk), and defendants' conduct was knowing or reckless.

159. Defendants' deceptive trade practice occurred in the course of their business of providing IVF services.

160. Defendants' deceptive trade practice affects all IVF patients because, unless patients ask, defendants represent to patients, including in a document titled, in part, "informed consent,"

that they have only two options for disposition of aneuploid embryos — discard or donate to quality control, training, or research — when defendants know that a third option exists, to transfer aneuploid embryos to an outside clinic or a storage facility.

161. Defendants' deceptive trade practice affects all IVF patients because defendants represent to patients that they have only two options for disposition of aneuploid embryos — discard or donate to quality control, training, or research — when defendants in fact will offer a third option when asked, to transfer aneuploid embryos to an outside clinic or a storage facility, and defendant will attempt to impose new contractual terms, including terms unrelated to the aneuploid embryos, on the patients if they elect this third option.

162. Defendants' deceptive trade practice is significant because it fails to notify patients of the option to transfer aneuploid embryos to an outside clinic or a storage facility and because the new terms that defendant will attempt to impose on the patients if they elect this third option provide no benefit to patients, require patients to give up rights otherwise available to them, and are terms to which some patients would decline to agree if provided a choice.

163. By not informing patients, in an "informed consent" document or otherwise, that a possibility exists to transfer aneuploid embryos to an outside clinic or a storage facility, defendant intentionally, and by design, employs its deceptive trade practice to discourage or prevent patients from transferring aneuploid embryos to an outside clinic or a storage facility and to impose new contractual terms on patients that are unfair or unconscionable.

164. In providing IVF services to the public, defendants are relatively more sophisticated than patients in describing IVF service options, including options for disposition of aneuploid embryos, and in writing contracts.

165. In providing IVF services to the public and in writing and offering contracts to patients, defendants have stronger bargaining power than patients.

166. Defendants' repeated posture to refuse to negotiate terms of the Embryo Release documents demonstrates that defendants knew that they were in a stronger bargaining position than plaintiffs and were exercising that disparate bargaining power.

167. The terms of defendants' Embryo Release versions confirm that defendants had stronger bargaining power than plaintiffs.

168. Defendants used their control over plaintiffs' precious and irreplaceable embryos to exercise bargaining power over plaintiffs to attempt to force plaintiffs to give up their legal rights and to interfere with plaintiffs' use of their property.

169. At the time of formation of the contract, defendants were more sophisticated than plaintiffs in their knowledge of IVF services and of Colorado law governing IVF services and contracts.

170. Defendants' deceptive trade practice and use of standard form contracts to implement this deceptive trade practice have significantly harmed IVF patients in the past and will continue to harm IVF patients in the future. The harm includes withholding treatment options from patients and withholding patients' property — their embryos — unless patients agree to terms that are not in their interest and to which some patients would not agree if provided a choice.

171. Plaintiffs suffered economic loss for amounts paid to defendant, to pharmacies, and for transportation, hotels, and other reasonable and necessary expenses.

172. Plaintiffs suffered loss of value and loss of use of the embryos.

173. Plaintiffs suffered emotional distress.

## FOURTH CLAIM FOR RELIEF

### Trespass to Chattels — All Defendants

174. Paragraphs 1 to 108 are incorporated herein by reference.

175. Defendants, with malice, intentionally and substantially interfered with plaintiffs' possession and use of the embryos by refusing to transfer the embryos to plaintiffs' designated storage facility unless plaintiffs agreed to terms in the Embryo Release documents to which they did not agree, including terms in Embryo Release #1 that would have required plaintiffs to forfeit known or foreseeable claims relating to an incident on February 14, 2020. *See* paragraphs 75 and 76, *supra.*

176. Plaintiffs informed defendants multiple times that plaintiffs did not agree to the terms to which defendants required plaintiffs to agree in order to receive their embryos.

177. Plaintiffs suffered loss of value and loss of use of the embryos.

178. Plaintiffs suffered emotional distress.

## FIFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress — All Defendants

179. Paragraphs 1 to 108 are incorporated herein by reference.

180. Defendants engaged in extreme and outrageous conduct when defendants, knowing that they had no legal basis to require plaintiffs to agree to the terms in Embryo Release #1, declined to transfer plaintiffs' embryos to a storage facility unless plaintiffs agreed to the terms in Embryo Release #1 that would have required plaintiffs to forfeit known or potential claims relating to an incident on February 14, 2020, *see* paragraphs 75 and 76, *supra;* when defendant Gustofson informed plaintiffs that defendants' legal counsel and insurance company required the

terms in Embryo Release #1; and when defendant Gustofson refused to negotiate the terms of Embryo Release #1.

181. Defendants engaged in the extreme and outrageous conduct described in paragraph 180 recklessly, with knowledge that a substantial probability existed that a disagreement about the subject of the embryos would cause emotional distress for plaintiffs.

182. Defendants' conduct described in paragraph 180 was extreme and outrageous in part because defendants abused their control over plaintiffs' property to interfere with plaintiffs' use and enjoyment of their property.

183. Defendants have continued to engage in extreme and outrageous conduct when they have refused to transfer plaintiffs' embryos to a storage facility unless plaintiffs agree to terms of Embryo Release documents that defendants have no legal basis to require plaintiffs to agree to and to which plaintiffs have not agreed.

184. Defendant FLC engaged in extreme and outrageous conduct when defendant FLC mailed plaintiffs a bill on March 4, 2021, for $650 to store the embryos in calendar year 2021.

185. Defendant's conduct caused severe emotional distress to plaintiffs.

186. Defendants' conduct has created constant fear for plaintiffs that defendants will destroy plaintiffs' embryos.

**SIXTH CLAIM FOR RELIEF**

**Negligent Misrepresentation — All Defendants**

187. Paragraphs 1 to 108 are incorporated herein by reference.

188. Defendants provided false information to plaintiffs in the IVF Consent and the CCS Consent about the universe of options for disposition of aneuploid embryos.

189. In the alternative, defendant Gustofson provided false information to plaintiffs about their options for disposition of aneuploid embryos.

190. Defendants provided information to plaintiffs in the normal course of their business.

191. Defendants were negligent in communicating information to plaintiffs about their options for disposition of aneuploid embryos.

192. Defendants provided information to plaintiffs with the knowledge and intent that plaintiffs would rely on it, and this information was false or incorrect.

193. Plaintiffs relied on the information that defendants provided to them.

194. Plaintiffs suffered economic loss for amounts paid to defendant, to pharmacies, and for transportation, hotels, and other reasonable and necessary expenses.

195. Plaintiffs suffered loss of value and loss of use of the embryos.

196. Plaintiffs suffered emotional distress.

**PRAYER FOR RELIEF**

197. **Specific Performance**.  Plaintiffs request that the court order defendants to perform the contract by releasing plaintiffs' embryos to plaintiffs' designated storage facility without a requirement for plaintiffs to agree to any terms, whether in any of defendants' Embryo Release documents or otherwise, and without a charge for storage of embryos.

198. Plaintiffs have suffered, and continue to suffer, loss of value and loss of use of the embryos in the amount of $10,000 per month since June 3, 2020.

199. Plaintiffs have suffered emotional distress in the amount of $150,000.

200. Plaintiffs have suffered monetary damages of $157,238.26 for payments to defendants, payments to pharmacies, and payments for transportation, hotels, and other reasonable and necessary expenses.

201. Defendants' conduct is "bad faith conduct" within the meaning of C.R.S. § 6-1-113(2.3) because the conduct is "fraudulent, willful, knowing, or intentional conduct that cause[d] injury."

202. Plaintiffs request treble damages pursuant to C.R.S. § 6-1-113(2).

203. Plaintiffs request statutory damages.

204. Plaintiffs request interest on damages pursuant to C.R.S. § 13-21-101.

205. Plaintiffs request reimbursement of litigation costs, expert witness fees, attorney's fees, other reasonable costs allowed by law, and such additional and further relief as the court deems just and proper.

Respectfully submitted,

Dated:  June 5, 2021

DOUGLAS F. CARLSON
Plaintiff
*Pro se*

Dated:  June 5, 2021

MAYA ZUBKOVSKAYA
Plaintiff
*Pro se*

PO Box 191711
San Francisco CA 94119-1711
(415) 956-9567
*doug.carlson@sbcglobal.net*