**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-01528-RM-NYW

DOUGLAS F. CARLSON and
MAYA ZUBKOVSKAYA,

      Plaintiffs,

v.

COLORADO CENTER FOR REPRODUCTIVE MEDICINE, LLC,
FERTILITY LABS OF COLORADO, LLC, and
ROBERT L. GUSTOFSON, M.D.,

      Defendants.

---

## ORDER

---

Magistrate Judge Nina Y. Wang

This action is before the court on

(1)     Defendants Colorado Center for Reproductive Medicine, LLC ("CCRM"), Fertility Labs of Colorado, LLC ("FLC"), and Robert L. Gustofson, M.D.'s ("Dr. Gustofson" and, together with CCRM and FLC, "Defendants") Motion to Compel Plaintiff Maya Zubkovskaya's Prior Medical Records ("Defendants' Motion to Compel"), [Doc. 42, filed February 2, 2022]; and

(2)     Plaintiffs Douglas F. Carlson ("Mr. Carlson" or "Plaintiff Carlson") and Maya Zubkovskaya's ("Ms. Zubkovskaya" or "Plaintiff Zubkovskaya" and, together with Mr. Carlson, "Plaintiffs") Motion to Compel Responses to Discovery Requests or, In the Alternative, for In Camera Review ("Plaintiffs' Motion to Compel" and, together with Defendants' Motion to Compel, the "Motions to Compel" or "Motions"), [Doc. 43, filed February 2, 2022].

This court considers the Motions pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated June 8, 2021, [Doc. 4], and the Memorandum dated February 3, 2022, [Doc. 44]. Upon review of the Motions, the Parties' briefing, applicable case law, and the entire case file, I respectfully **GRANT IN PART AND DENY IN PART** Defendants' Motion to Compel; and **DENY without prejudice** Plaintiff's Motion to Compel.

**BACKGROUND**[1]

The court has previously discussed the factual background of this case in detail, *see* [Doc. 39 at 2–5], and will do so again here to the extent necessary to resolve the instant Motions. This action arises from Plaintiffs' in vitro fertilization ("IVF") treatment that they underwent with Defendants CCRM and Dr. Gustofson. *See* [Doc. 41].

In 2018, Plaintiffs contacted the CCRM clinic in Lone Tree, Colorado to request consultations for possible IVF treatment. [*Id.* at ¶ 36]. In November 2018, Dr. Gustofson informed Plaintiffs that the success rate for IVF at Ms. Zubkovskaya's age at the time, 44, was approximately ten percent. [*Id.* at ¶ 37]. In December 2018, Dr. Gustofson informed Plaintiffs that the pregnancy rate for a patient in Ms. Zubkovskaya's situation would range between ten and twenty percent per IVF cycle, "and the chance of having at least one good embryo and a successful pregnancy after three cycles of IVF was 25 to 30 percent." [*Id.* at ¶ 39]. Plaintiffs allege that these success rates "did not accurately reflect their chance of success." [*Id.* at ¶ 41]. Plaintiffs also allege that Dr. Gustofson and CCRM either (a) knew that the quoted success rates were incorrect or (b) "were aware that they did not know" whether the quoted success rates "were consistent with the success rates contained in, or deliverable from, statistics, data, and other information to which [D]efendants

---

[1] The court draws any facts from the operative Second Amended Complaint for Damages and Specific Performance ("Second Amended Complaint"), [Doc. 41, filed September 2, 2021].

Gustofson and CCRM had access." [*Id.* at ¶¶ 42–43]. Plaintiffs relied on the success rates quoted by Dr. Gustofson, and would not have treated with him and CCRM "if they had known the true and accurate success rates for patients in situations similar to theirs." [*Id.* at ¶¶ 49–50].

In December 2018, Plaintiffs and Defendants agreed to proceed with IVF treatment. [*Id.* at ¶ 52]. On December 25, 2018, before she began her treatment, Ms. Zubkovskaya contacted CCRM to inquire about her options for transferring any abnormal embryos—also known as aneuploid embryos, [*id.* at ¶ 27]—to another clinic in the event she did not provide any embryos that tested normal. [*Id.* at ¶ 55]. The next day, Dr. Gustofson responded that while Ms. Zubkovskaya did have the option to transfer her aneuploid embryos to another clinic, once transferred, she would "no longer be eligible for care through CCRM in any method at any point in the future." [*Id.* at ¶ 57 (quotations and citation omitted)]. Plaintiffs began their IVF treatment in January 2019. [*Id.* at ¶ 59].

Plaintiffs conducted six cycles of IVF treatment. [*Id.* at ¶ 78]. On February 14, 2020, CCRM informed Plaintiffs that all three of their viable embryos at the time were aneuploid. [*Id.* at ¶¶ 78–80]. Plaintiffs ended their IVF treatment with Defendants later that month. [*Id.* at ¶ 85]. On May 5, 2020, an employee of CCRM or FLC contacted Ms. Zubkovskaya regarding the aneuploid embryos and stated, "[a]ccording to your consent, you have chosen to have your abnormal embryos donated to research." [*Id.* at ¶ 86 (quotations omitted)]. Thereafter, Plaintiffs and Defendants negotiated a "Release, Indemnification, and Hold Harmless Agreement for Transfer of Abnormal Embryos" ("Embryo Release") that Plaintiffs were required to execute, and which included confidentiality provisions. [*Id.* at ¶¶ 87–111]. Plaintiffs allege that certain provisions in the negotiated versions of the Embryo Release do not accurately reflect other agreements and communications between Plaintiffs and Defendants. [*Id.* at ¶¶ 112–15]. Plaintiffs

have not signed any version of the Embryo Release, and Defendants have not released the embryos to Plaintiffs.  [*Id.* at ¶¶ 116–17].

In the Second Amended Complaint, Plaintiffs assert a total of eight claims.  The first six claims are with respect to the embryos, and against all Defendants as follows: breach of contract (Claim I); fraud (Claim II); violation of the Colorado Consumer Protection Act ("CCPA") (Claim III); trespass to chattels (Claim IV); and negligent misrepresentation (Claim V).  [*Id.* at ¶¶ 123–202].  The remaining three claims are with respect to the success rate for IVF treatment that was quoted to Plaintiffs, and against Defendants Gustofson and CCRM: fraud (Claim VI); violation of the CCPA (Claim VII); and negligent misrepresentation (Claim VIII).  [*Id.* at ¶¶ 210–24].  Plaintiffs also request that the court order Defendants to perform the applicable "contract" by releasing Plaintiffs' embryos to Plaintiffs' designated storage facility without requiring Plaintiffs "to agree to any terms, whether in any of [D]efendants' Embryo Release documents or otherwise, and without a charge for storage of embryos."  [*Id.* at ¶ 225].

## LEGAL STANDARDS

### I.  Rule 26(b)(1)

Rule 26(b)(1) of the Federal Rules of Civil Procedure defines the scope of permissible discovery here.  The Rule permits discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  In considering whether the discovery sought is proportional, the court weighs the importance of the discovery to the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  *Id.*

This definition of the permissible scope does not include all information "reasonably calculated to lead to admissible evidence."  The amendments to Rule 26, effective December 1, 2015, purposefully removed that phrase.  *See In re Bard Filters Products Liability Litig.*, 317 F.R.D. 562, 564 (D. Ariz. 2016).  As explained by the *Bard* court, the Advisory Committee on the Federal Rules of Civil Procedure was concerned that parties and courts had incorrectly used the phrase to expand the scope of discovery to a point where the scope "might swallow any other limitation." *Id.* (citing Fed. R. Civ. P. 26 advisory committee's notes to 2015 amendment).  Rather, the applicable test is whether the evidence sought is relevant to any party's claim or defense and proportional to the needs of the case, though the information sought need not be admissible to be relevant to a claim or defense.  *Id.*; Fed. R. Civ. P. 26(b)(1).  Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

The Advisory Committee Notes to the 2015 Amendments make clear that the party seeking discovery does not bear the burden of addressing all proportionality considerations.  Fed. R. Civ. P. 26 advisory committee's notes to 2015 amendment.  Generally, when discovery on its face appears to be relevant, the responding party bears the burden of establishing that the requested discovery (1) does not fall within the scope of relevant evidence, or (2) is of such marginal relevance that the potential harm of discovery is outweighed by the benefit.  *Simpson v. Univ. of Colo.*, 220 F.R.D. 354, 356 (D. Colo. 2004) (citations omitted).  The objecting party cannot "sustain this burden with boilerplate claims that the requested discovery is oppressive, burdensome or harassing." *Id.* (citation omitted).  But when the relevance of a discovery request or device is not apparent on the face of the request or device itself, the proponent of the discovery bears the

burden of making an initial showing of relevance.  *See Thompson v. Jiffy Lube Int'l, Inc.*, No. 05-1203-WEB, 2007 WL 608343, at *8 n.20 (D. Kan. Feb. 22, 2007).

## II.   Rule 37

Pursuant to Rule 37(a)(1), a party may move for a court order compelling disclosure or discovery, and must certify that she "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."  Fed. R. Civ. P. 37(a)(1).  A motion to compel may include a party's failure to produce documents requested pursuant to Rule 34.  *See* Fed. R. Civ. P 37(a)(3)(B)(iv). "The party moving to compel discovery must prove that the opposing party's answers are incomplete[,]" and the "party objecting to discovery must establish that the requested discovery does not fall under the scope of relevance as defined in Rule 26(b)(1)."  *Tara Woods Ltd. P'ship v. Fannie Mae*, 265 F.R.D 561, 566 (D. Colo. 2010).

## ANALYSIS

## I.   Defendants' Motion to Compel

Defendants seek an order compelling the production of records from Plaintiff Zubkovskaya's medical providers from January 1, 2014 to the present "that relate in any way to issues of infertility."  [Doc. 42 at 1].[2]  Plaintiffs object to this request on relevancy and privilege grounds.  *See* [Doc. 47].  The court will address the Parties' arguments below.

### A.   Record Before the Court

Before turning to the Parties' arguments, the court considers the record before it—namely,

---

[2] The court will refer to Ms. Zubkovskaya's medical records from January 2014 to the start of her treatment with Defendants in December 2018 as her "pre-CCRM" records; and will refer to Ms. Zubkovskaya's medical records after her treatment with Defendants ended in February 2020 to the present as her "post-CCRM" records.

Defendants' Reply in Support of their Motion to Compel ("Reply"), [Doc. 49]; and "Plaintiffs' Response to Defendants' Reply Regarding Production of Medical Records; Motion for Leave to Respond" ("Surreply"), [Doc. 51].

 **Defendants' Reply.**  Plaintiffs filed their Response to Defendants' Motion to Compel on February 9, 2022.  *See* [Doc. 47].  Therefore, Defendants' Reply was due fourteen days later, on February 23, 2022.  *See* D.C.COLO.LCivR 7.1(d) ("The moving party may file a reply no later than 14 days after the date of service of the response, or such lesser or greater time as the court may allow.").  However, Defendants did not file their Reply until February 24, 2022.  *See* [Doc. 49].  Thus, Defendants' Reply was not timely.  In addition, Defendants did not seek leave of court to file their Reply out of time, nor do they acknowledge the untimeliness of their filing in the Reply.  *See* [*id.*].  In any event, the court finds that that Defendants' filing their Reply one day out of time does not warrant the court's non-consideration of the same.  Accordingly, the court will consider Defendants' Reply in deciding the instant Motion.

 **Plaintiffs' Surreply.**  Plaintiffs filed their Surreply on February 28, 2022—four days after Defendants' Reply.  *See* [Doc. 51].  Neither the Federal Rules of Civil Procedure nor this District's Local Rules of Civil Practice allow for surreplies as a matter of right.  In the Tenth Circuit, "[a] district court must permit a surreply where it relies on new materials—i.e., new evidence or new legal argument—raised in a reply brief."  *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, No. 06-cv-00037-PAB-CBS, 2010 WL 420046, at *10 (D. Colo. Feb. 1, 2010) (citing *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006)).  "However, where the materials are not new or a court disregards any materials that are, that court need not permit a surreply."  *Id.* (citing *Green v. New Mexico*, 420 F.3d 1189, 1196–97 (10th Cir. 2005)).

Here, Plaintiffs seek leave to submit their Surreply on the basis that Dr. Gustofson's Affidavit, which Defendants attach to their Reply,

> should have accompanied the original motion, where [D]efendants first denied without evidence that they received [P]laintiff Zubkovskaya's prior medical records . . . *because [D]efendants are misrepresenting the facts concerning the medical records that [P]laintiffs submitted before treatment began in 2018, and because [D]efendants advance a new theory about the relevance of records to their damages.*

[*Id.* at 1–2 (emphasis added)].   Specifically, with respect to the pre-CCRM medical records, Plaintiffs assert that Ms. Zubkovskaya provided to CCRM all records that were requested of her in 2018, and they "strongly reject [D]efendants' insinuation that they are to blame for [D]efendant Gustofson not being 'provided' these important records."   [*Id.* at 2–5].   As to the post-CCRM medical records, Plaintiffs assert that "Defendants inaccurately describe the need for medical records to assess damages."   [*Id.* at 6 (capitalizations omitted)].   Plaintiffs argue their First and Fifth claims seek "damages from emotional distress and loss of use of the aneuploid embryos that [D]efendants are holding hostage" and "their private records of subsequent IVF 'assessments' and 'treatments' are irrelevant to the loss of use claims."   [*Id.* at 6–7].   Plaintiffs further argue that their Sixth and Eighth Claims seek damages in the form of "fees that [P]laintiffs paid to [D]efendant CCRM, along with other expenses that they incurred" and, therefore, Ms. Zubkovskaya's post-CCRM medical records "are not relevant to damages from either category of claims except in the limited scope . . . relating to loss of use, and [P]laintiffs have provided those records."   [*Id.* at 7].

At the outset, the court notes that Plaintiffs' request for leave to submit the Surreply contained *within* the Surreply is improper.   *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document.").   However, notwithstanding this improper filing, the court agrees with Plaintiffs that Defendants' Reply presents new information in the form of Dr. Gustofson's Affidavit, [Doc. 49-

1], and advances a new legal argument related to the relevance of Plaintiff Zubkovskaya's post-CCRM treatment records that Defendants did not advance in their Motion. *Compare* [Doc. 42 at 5] *with* [Doc. 49 at 5–6]. Moreover, Plaintiffs filed their Surreply only after Defendants filed their Response out of time, and the court finds it would be inconsistent to accept Defendants' late Reply containing new arguments without also accepting Plaintiffs' Surreply addressing those arguments. Thus, the court will consider Plaintiffs' Surreply.[3]

### B.   The Parties' Arguments

At issue here is the following request for production:

Produce all medical records for Plaintiff Maya Zubkovskaya's treating health care providers from January 1, 2014 through February 2020 that relate in any way to issues of infertility.

[Doc. 47-2 at 8]. Plaintiffs object to that request on the grounds that it "seeks information protected by the physician-patient privilege" and because it "seeks information that is not relevant to the allegations, claims, or issues in this case, and it is overly broad in scope and time period." [Doc. 47-1 at 2].[4]

---

[3] The Parties are advised that the court's acceptance of their filings does not excuse them from complying with the Local Rules in the future. All Parties are represented by counsel who are members of the Bar of this District Court. As such, counsel have certified their familiarity with the Local Rules of Practice of this court. *See* D.C.COLO.LAttyR 3(b)(2). The Parties are advised that future noncompliance with this court's Local Rules of Practice or Orders of this court may result in the court striking the filing without substantive consideration.

[4] The court notes Defendants' failure to identify the specific discovery request and response at issue in their Motion, despite their general references to them. *See* [Doc. 42 at 3]; *see* D.C.COLO. LCivR 37.1 ("A motion under Fed. R. Civ. P. 26 or 37 directed to an interrogatory, request, or response under Fed. R. Civ. P. 33, 34, or 36 shall set forth either in the text of the motion or in an exhibit to the motion the specific interrogatory, request, or response to which the motion is directed."). In the Response, Plaintiffs explain that sometime after this action commenced, Defendants served a request for production seeking "all medical records for Plaintiff Maya Zubkovskaya's treating health care providers for the years 2013 to the present that relate in any way to infertility." [Doc. 47-1 at 2]. Plaintiffs objected, stating,

As discussed above, Rule 26 of the Federal Rules of Civil Procedure provides that a party may discover any nonprivileged matter relevant to the party's claim or defense, as long as it is proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1); *Larson v. Larson*, 687 Fed. App'x 695, 707 (10th Cir. 2017).  The court considers first the question of relevance, second the issue of privilege, and, finally, whether the discovery sought is proportional to the needs of the case.

### 1.    Relevance

Relevance is broadly construed, and "a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *Sheldon v. Vermonty*, 204 F.R.D. 679, 689–90 (D. Kan. 2001) (citations omitted); *see also Carbajal v. Warner*, No. 10-cv-02862-REB-KLM, 2013 WL 1129429, at *3 (D. Colo. Mar. 18, 2013) (same).  The party seeking production has the initial burden of showing relevance.  *See*

---

> [t]his request seeks information protected by the physician-patient privilege. This request also seeks information that is not relevant to the allegations, claims, or issues in this case, and it is overly broad in scope and time period.

[*Id.*].  Plaintiffs contend that "[t]his discovery request, RFP #6, apparently is the subject of" the instant Motion to Compel.  [Doc. 47 at 4].  In addition, Plaintiffs explain that, on January 19, 2022, Defendants "served amended discovery requests that, [P]laintiffs understand, supersede the original discovery requests."  [*Id.*].  Plaintiffs also explain that the request for production at issue is now RFP #5, which states,

> [p]roduce all medical records for Plaintiff Maya Zubkovskaya's treating health care providers from January 1, 2014 through February 2020 that relate in any way to issues of infertility.

[Doc. 47-2 at 8].  Plaintiffs do not, however, indicate that they have submitted a response to this amended discovery request.   Plaintiffs also attach copies of each discovery request, which similarly reflect that Plaintiffs have responded to the Defendants' first, apparently now superseded, set of discovery requests, *see* [Doc. 47-1], and have not responded to the amended requests, *see* [Doc. 47-2].  Defendants' Reply, again, does not address the specific discovery request and response at issue.  *See* [Doc. 49].  Based on Plaintiffs' representations and the Parties' arguments, the court understands that the discovery request at issue here is RFP #5 in Defendants' amended discovery requests.  *See* [Doc. 47-2 at 8].  Further, notwithstanding Plaintiff's non-response to that particular discovery request, the court understands that—based on the Parties' respective arguments—Plaintiffs intend to assert the same objections to RFP #5 in the amended discovery request as those asserted against superseded RFP #6.

*Chung v. Lamb*, No. 14-cv-03244-KLM, 2017 WL 10619941, at *3 (D. Colo. Oct. 24, 2017) (citing *Johnson v. Kraft Foods N. Am., Inc.*, 236 F.R.D. 535, 539 (D. Kan. 2006)).  Evidence is considered relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Claims VI, VII and VIII all arise from Plaintiffs' allegations that Dr. Gustofson misrepresented the likelihood of success of her IVF treatments.  [Doc. 41 at ¶¶ 203–24].  To state a claim for fraud,[5] "a plaintiff . . . must establish five elements: (1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff."  *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).  The elements of a claim of negligent misrepresentation are substantially similar: "(1) one in the course of his or her business, profession or employment; (2) makes a misrepresentation of a material fact, without reasonable care; (3) for the guidance of others in their business transactions; (4) with knowledge that his or her representations will be relied upon by the injured party; and (5) the injured party justifiably relied on the misrepresentation to his or her detriment."  *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011).  Finally, to prevail on a private right of action brought pursuant to the CCPA, a plaintiff must establish five elements:  "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's

---

[5] The Amended Complaint does not identify the state law applicable to Plaintiffs' fraud and negligent misrepresentation claims, i.e., Claim VI and VIII.  But as the Colorado Supreme Court has noted, "the elements of fraud in California and Colorado are identical in all substantive respects."  *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).

business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential

consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in

fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury."

*Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011).

    ***Pre-CCRM Medical Records.***  Here, Defendants argue that Ms. Zubkovskaya's pre-

CCRM medical records are relevant to Plaintiffs' claims because "complaints about Dr.

Gustofson's assessment and representation of Plaintiff Zubkovskaya's infertility cannot be

evaluated without considering the condition which he was evaluating – Plaintiff Zubkovskaya's

infertility." [Doc. 42 at 4].  Defendants insist that "the extent of Plaintiff Zubkovskaya's infertility

prior to receiving IVF treatment from CCRM and Dr. Gustofson is of consequence in evaluating

whether CCRM and Dr. Gustofson falsely or negligently represented Plaintiffs' chance of success

with IVF."  [*Id.*].  Relatedly, Defendants also assert that "Dr. Gustofson requested Plaintiff

Zubkovskaya's prior laboratory studies and medical records relating to her prior medical history,

prior gynecological history, prior pregnancy history, and prior infertility assessments, treatments

and outcomes, in advance of his consultation with Plaintiffs."  [Doc. 49 at 4].  Despite these

requests, Defendants contend, Dr. Gustofson "was never provided any prior medical records."[6]

---

[6] In response to Defendants' argument that Dr. Gustofson "was never provided any prior medical records" of Plaintiff, Plaintiffs contend that they provided various medical records to Defendants in 2018, and they submit two supporting affidavits of Ms. Zubkovskaya.  *See* [Doc. 47 at 2–4; Doc. 51 at 3–5]; *see also* [Doc. 47-3; Doc. 51-1].  Plaintiffs claim that Ms. Zubkovskaya "did everything that was asked of her before her first meeting with [D]efendant Gustofson on November 6, 2018."  [Doc. 51 at 3 (arguing that Ms. Zubkovskaya "sent 19 pages of records from Freyja Clinic to CCRM on October 28, 2018" and "sent additional records to [CCRM] on October 29, 2018.")].  Moreover, Plaintiffs acknowledge that "[p]erhaps [D]efendant Gustofson truly 'was not provided' records from [Ms.] Zubkovskaya"; but they contend that "CCRM's medical records confirm that his employer and co-defendant received well over 100 pages from plaintiff Zubkovskaya, including 98 pages before the telephone consultation on November 6, 2018, and the one-day workup on December 11, 2018, where he estimated a chance of success of 25 to 30 percent."  [*Id.* at 4–5].  Plaintiffs also argue that Defendants' "behavior suggest[ ] that the true

[*Id.*].  Defendants continue: "[b]ecause he was not provided with any of Ms. Zubkovskaya's prior medical records, Dr. Gustofson relied upon her representations of her medical history to estimate Ms. Zubkovskaya's chance of success in becoming pregnant with IVF treatment."   [*Id.*]. Defendants further insist that Ms. Zubkovskaya's pre-CCRM medical history was "a prerequisite to participating in a consultation for IVF treatment at CCRM" *and* "it provided important information to Dr. Gustofson's analysis of Plaintiffs' chance of success with IVF treatment compared to the statistical data for age related comparison patients using IVF treatment to become pregnant."   [*Id.*].   Thus, Defendants argue, any "medical records that support or contradict [Plaintiff Zubkovskaya's] representations of her medical history are therefore important in evaluating Plaintiffs' claims that Defendants provided an inaccurate estimation."   [*Id.*]. Defendants attach to their Reply the Affidavit of Dr. Gustofson, who attests to the assertions made in the foregoing line of argument.  *See* [Doc. 49-1].

Plaintiffs counter that Ms. Zubkovskaya's medical records predating her treatment at CCRM are irrelevant because "[t]he only facts of consequence to resolving" Plaintiffs' Sixth, Seventh, and Eighth Claims "are facts known to [D]efendant Gustofson on December 11, 2018, when he predicted a 25 to 30 percent chance of success" for Ms. Zubkovskaya's IVF treatment. [Doc. 47 at 9].   Plaintiffs argue that "[r]ecords from [P]laintiffs' pre-CCRM treatment that [D]efendants do not already have will not make the accuracy of his prediction based on the

---

purpose of this discovery request . . . is to annoy, embarrass, and oppress [P]laintiff Zubkovskaya", [Doc. 47 at 14], and that Ms. Zubkovskaya "would suffer irreparable harm from loss of privacy if [D]efendants received privileged medical records that are not relevant to the issues in this case", [Doc. 51 at 9].  Ultimately, Plaintiffs' arguments about the sufficiency of prior submissions of historic medical records is insufficient to persuade this court that the requested discovery is not relevant or proportional under Rule 26(b)(1) as discussed further below.  In addition, while this court is mindful of Ms. Zubkovskaya's privacy concerns, such concerns may be addressed through a protective order.

information available to him in 2018 more or less probable." [*Id.*]. Plaintiffs further argue that "[p]erhaps the best clue of all about the irrelevance of the old records is that [D]efendants' own records release form for new patients does not ask for records older than two years, except for certain surgeries." [*Id.* at 10].[7] Plaintiffs insist that Defendants "seem to want to conduct a reverse malpractice defense, fishing through plaintiff Zubkovskaya's sensitive and personal medical records for some nugget that would allow them to claim that [D]efendant Gustofson correctly predicted [P]laintiff Zubkovskaya's chance of success after all." [*Id.*].

The court finds that Defendants have met their burden of establishing the relevance of Plaintiffs' pre-CCRM medical records related to infertility. Plaintiffs' Sixth, Seventh, and Eighth Claims relate to the success rates that Defendants represented to Plaintiffs at the time of their consultation in 2018 based on the information that Dr. Gustofson knew at the time he made such statements. *See* [Doc. 41 at ¶¶ 203–24]. In the Second Amended Complaint, Plaintiffs allege that Defendants "falsely represented [P]laintiffs' chance of success from IVF treatment at CCRM" and that such rates "were higher than the success rates contained in, or derivable from, statistics, data, and other information to which [D]efendants Gustofson and CCRM had access and of which they had actual or constructive knowledge." [*Id.* at ¶¶ 204, 209, 212, 219]. If this was Plaintiffs' only allegation, this court would agree that Ms. Zubkovskaya's prior medical history would not be relevant to Defendants' defenses. But Plaintiffs also allege that Defendants inaccurately assessed Ms. Zubkovskaya's chances of becoming pregnant, *see* [*id.* at ¶ 41], which, as Plaintiffs acknowledge, would have been based at least in part on information about Ms. Zubkovskaya's health that she provided to Defendants around the time they provided such assessment, *see* [Doc. 47 at 2–3]. To the extent that Ms. Zubkovskaya's prior medical history reveals different or omitted

---

[7] Plaintiffs do not provide any evidence of Defendants' record release.

information than what was disclosed to Dr. Gustofson, such information is relevant to the assessment of the accuracy of Defendants' representations of her chances to become pregnant. In addition, information about what other medical providers may have told Ms. Zubkovskaya regarding her chances of becoming pregnant may factor into whether Plaintiffs reasonably relied upon Defendants' representations about that same topic—elements of both her fraud and negligent misrepresentation causes of action.

Accordingly, the court finds the pre-CCRM medical records to be relevant to Plaintiffs' Sixth, Seventh, and Eighth claims in this action.

***Post-CCRM Medical Records.*** With respect to Defendants' request for Ms. Zubkovskaya's post-CCRM medical records, Defendants assert that "[a]lthough Plaintiffs' treatment with Defendants ceased in February 2020, the fact that Plaintiff Zubkovskaya is continuing to undergo IVF treatment makes her medical records related to infertility after February 2020 similarly relevant to evaluating the legitimacy of Plaintiffs' claims." [Doc. 42 at 5]. Defendants also argue that such records are "relevant to evaluating the basis for Plaintiffs' damages; namely, that Defendants did not accurately estimate Plaintiff Zubkovskaya's ability to become pregnant with IVF treatment." [Doc. 49 at 5–6].

Insofar as Ms. Zubkovskaya's post-CCRM records may be relevant for the purposes of assessing Plaintiffs' damages, as Defendants claim, Plaintiffs acknowledge that "the *nature* of treatments received after [P]laintiffs ended their treatment with CCRM are relevant to their claim for loss of the aneuploid embyros because if they had had the embryos, they might have avoided those treatments." [Doc. 47 at 7 n.1 (emphasis in original)]. Plaintiffs also claim those documents are relevant to their "claims for emotional distress from the treatments." [*Id.*]. Therefore, Plaintiffs assert, they have "provided these billing records [to Defendants] in previous disclosures, without

waiving privilege more broadly, in order to allow [D]efendants fairly to verify these expenses." [*Id.*].  Notably, Defendants do not respond to the foregoing arguments by Plaintiffs.  *See* [Doc. 49].

The court finds that Defendants have not met their burden of establishing the relevance of Ms. Zubkovskaya's post-CCRM medical records, and their general assertion that such records are "relevant to evaluating the legitimacy of Plaintiffs' claims" does not meet this burden.  Without a sufficient showing by Defendants, the fact that Ms. Zubkovskaya continues to undergo IVF treatment does not make all of her post-CCRM medical records related to infertility relevant to her Sixth, Seventh, or Eighth Claims.  Likewise, Defendants' failure to address Plaintiffs' assertion that they have already exchanged their billing records to allow Defendants to verify their medical expenses indicate to the court that Plaintiffs have sufficiently responded to Defendants' request for their post-CCRM records for the purpose for which Defendants claim they are relevant—to assess Plaintiff's damages.

### 2.      Privilege

In a diversity case such as this one, applicable privileges are governed by the state law of the forum.  *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995) (citing Fed. R. Evid. 501; *White v. American Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990)).  Under Colorado law:

> a physician, surgeon, or registered professional nurse duly authorized to practice his profession pursuant to the laws of this state or any other state shall not be examined without the consent of his patient as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

Colo. Rev. Stat. § 13-90-107(d). This privilege applies "equally to in-court testimony and to pretrial discovery of information."  *Weil v. Dillon Companies, Inc.*, 109 P.3d 127, 129 (Colo.

2005).  "Taken together, C.R.C.P. 26(b)(1) and section 13-90-107(d) establish that, even if relevant to the subject matter involved in the pending action, a party is not necessarily entitled to discovery of information from a physician relating to the treatment of a patient."  *Alcon v. Spicer*, 113 P.3d 735, 738 (Colo. 2005).  The purpose of the privilege is to protect a patient's ability to be candid with her physician and secure the medical treatment necessary without the embarrassment or humiliation disclosure might cause.  *Id*. at 738; *see also Cardenas v. Jerath*, 180 P.3d 415, 424 (Colo. 2008).

But like most privileges, the physician-patient privilege is not absolute and can be waived, either expressly or impliedly.  "[P]rivilege holders inject their physical or mental condition into a case as the basis of a claim when they utilize the condition as the predicate for some form of judicial relief."  *Gadeco, LLC v. Grynberg*, 415 P.3d 323, 326 (Colo. 2018) (internal quotations omitted).  Thus, ordinarily, when a party has put a particular physical condition at issue, such as through claiming a specific personal injury and/or damages for such injury, she has waived her physician-patient privilege as to the treatment related to such conditions, but maintains the privilege for medical records wholly unrelated to her injuries and damages claimed.  *See Alcon*, 113 P.3d at 739; *Cardenas*, 180 P.3d at 424 ("This waiver does not amount to a general disclosure of the patient's entire medical history, but rather is limited to the cause and extent of the injuries and damages claimed.").  Accordingly, "'relevance alone cannot be the test' for waiver of the physician-patient privilege."  *Alcon*, 113 P.3d at 741 (quoting *Weil v. Dillon Cos., Inc.*, 109 P.3d 127, 131 (Colo. 2005)).

Here, Plaintiffs seek to withhold their pre- and post-CCRM medical records related to Ms. Zubkovskaya's infertility, arguing that Defendants "did not cause injuries that [P]laintiff Zubkovskaya's private medical records would explain" but, "[i]nstead, [P]laintiffs claim economic

damages from fraud and misrepresentation." [*Id.* at 12]. Plaintiffs insist that the "actual issue is whether the historical information available to [D]efendant Gustofson and CCRM on December 11, 2018, supported the success rate that he predicted" and "[t]he time to examine her pre-CCRM records has long passed." [*Id.*].

Defendants argue that Plaintiffs have waived the physician-patient privilege because "Plaintiff Zubkovskaya's infertility is the predicate of Plaintiffs' claims". [Doc. 49 at 6 (capitalizations omitted)]. Specifically, Defendants argue that "[t]o prove their claim that Defendants overestimated or misrepresented Plaintiffs' chance of success with IVF treatment compared to other available statistics, Plaintiffs must necessarily consider that other statistics vary by patient and treatment characteristics." [*Id.* at 7]. Defendants continue: "Plaintiff Zubkovskaya's prior medical history and records thereof relating to such characteristics is a predicate to evaluating whether Defendants misrepresented Plaintiffs' chance of success with IVF treatment compared to other statistical data that is based upon those same characteristics." [*Id.*]. Thus, Defendants contend, Plaintiffs have waived the physician-patient privilege as to Ms. Zubkovskaya's medical records "relating to issues of infertility in bringing this case." [*Id.*]. Defendants also argue "[t]he fact that Plaintiffs do not allege a personal injury claim or a medical negligence claim" in this case does not preclude a finding that Plaintiffs have waived the physician-patient privilege. [*Id.* at 7–8]. Having found that Defendants have failed to establish the relevance of Ms. Zubkovskaya's post-CCRM medical records, this court focuses its analysis only upon the pre-CCRM medical records.[8]

---

[8] And, as explained above, insofar as the post-CCRM records may be relevant for the purposes of assessing Plaintiffs' damages, as Defendants claim, *see* [Doc. 49 at 10], Defendants fail to respond to Plaintiffs assertion that they have provided their post-CCRM "billing records [to Defendants] in previous disclosures, without waiving privilege more broadly, in order to allow [D]efendants fairly to verify these expenses." [Doc. 47 at 7 n.1].

*Pre-CCRM Medical Records.*  Using the principles explained above and the purpose of the physician-patient privilege as guideposts, this court finds that Plaintiff Zubkovskaya has waived the physician-patient privilege with respect to her pre-CCRM medical records related to infertility.

Relevant here, to prevail on a fraud claim (Plaintiffs' Sixth Claim for relief), a plaintiff must establish "(1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff."  *Bristol Bay Productions, LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).  The fifth element contains "three discrete sub-parts, requiring the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages."  *Id.* (citing CJI–Civ. 19:1 (2013) (listing the seven elements of a fraud claim)).

Plaintiff's Sixth, Seventh, and Eighth claims relate to the IVF success rates that Defendants provided Plaintiffs, which in turn were based on Plaintiff Zubkovskaya's medical history. Plaintiffs allege that Defendants "falsely represented [P]laintiffs' chance of success from IVF treatment at CCRM."  [Doc. 41 at ¶ 204].  Plaintiffs also allege that Defendants "were aware that the success rates that Dr. Gustofson quoted to plaintiffs . . . were higher than the success rates contained in, or derivable from, statistics, data, and other information to which [D]efendants Gustofson and CCRM had access and of which they  had actual or constructive knowledge."  [*Id.* at ¶ 42].  Thus, the court finds that Ms. Zubkovskaya has placed her medical condition at issue in this action, including the information that Dr. Gustofson considered in reaching his conclusions regarding Ms. Zubkovskaya's likelihood of success of getting pregnant.

Moreover, Plaintiffs' objection to the discovery of Ms. Zubkovskaya's pre-CCRM medical records on the basis that Dr. Gustofson's purportedly did not rely upon those records goes to the potential admissibility and weight of the evidence, not its discoverability. *Cf. Anchondo-Galaviz v. State Farm Mut. Automobile Ins. Co.*, No. 18-cv-01322-JLK-NYW, 2019 WL 11868519, at *5 (D. Colo. July 19, 2019) (finding the plaintiff's argument—that "[w]hile Defendant states that Plaintiff's treatment was ineffective, Defendant makes this bald assertion out of context of Plaintiff's full deposition testimony and in contradiction to the medical records"—"fail[ed] to address discoverability, but [went] to the potential admissibility and weight of evidence" (quotations and citation omitted)).

In sum, the court concludes that Plaintiffs have waived the physician-patient privilege with respect to Ms. Zubkovskaya's pre-CCRM medical records related to infertility. *See Steven Blanco, Sr. v. HCA-Healthone, LLC*, No. 19-cv-00928-PAB-SKC, 2021 WL 351252, at *1 (D. Colo. Feb. 2, 2021) ("Thus, Plaintiffs have waived any physician-patient privilege or privacy rights related to the autopsy or the cause of death by placing those matters squarely at issue in this litigation."); *Adams v. Womble*, No. 14-cv-01431-RM-NYW, 2016 WL 11692349, at *2 (D. Colo. June 28, 2016) ("Because Ms. Adams contends that her injuries and the resulting damages were caused by Dr. Womble's surgery and his negligence . . . the court finds that Ms. Adams has waived any physician-patient privilege with the medical treatment providers who provided Ms. Adams care and consulted with Dr. Womble . . .").

### 3.    Proportionality

The court also finds Defendants' request for Ms. Zubkovskaya's pre-CCRM medical records are proportional to the needs of this case.[9]  In considering whether the discovery sought is

---

[9] Given this court's finding that Defendants have not established the relevance of Ms.

proportional, the court weighs the importance of the discovery to the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).

Defendants do not expressly address proportionality.  *See* [Doc. 42; Doc. 49].  However, Defendants argue that their request for Ms. Zubkovskaya's medical records from January 1, 2014 to the present is "properly limited in temporal scope" as Plaintiff Zubkovskaya began her IVF treatment with Defendants in 2018.  *See* [Doc. 42 at 5].

Plaintiffs argue that "revealing private medical records on an emotionally sensitive subject would not be proportional to the needs of this case due to the limited probability that this information could affect the outcome, thus reducing the importance of it."  [Doc. 47 at 11]. Plaintiffs further contend that "many of the records are not in plaintiffs' possession, so requesting, gathering, and reviewing them for disclosure would be burdensome."  [*Id.*].  The court is unpersuaded by Plaintiffs' arguments.

Although the court notes the sensitive nature of the subject matter of this case, as explained above, Plaintiffs have placed Ms. Zubkovskaya's infertility at issue in this matter.  In addition, Plaintiffs appear to acknowledge that they have access to the records at issue.  *See* [Doc. 47 at 11]. And while Plaintiffs claim that "requesting, gathering, and reviewing [those records] for disclosure would be burdensome", [*id.*], Plaintiffs fail to explain how they would be overly burdened by the production of Ms. Zubkovskaya's pre-CCRM medical records.  Notably, Plaintiffs do not cite burdensomeness in their objections to Defendants' request for "all medical records for Plaintiff

---

Zubkovskaya's post-CCRM treatment records, the court declines to address whether those records are proportional to the needs of this case.

Maya Zubkovskaya's treating health care providers for the years 2013 to the present that relate in any way to issues of infertility." [Doc. 47-1 at 2]. Instead, Plaintiffs objected to that request on the grounds that it "seeks information protected by the physician-patient privilege" and "is not relevant to the allegations, claims, or issues in this case, and it is overly broad in scope and time period." [*Id.*]. Plaintiffs may not amend their objections in their response to a motion to compel.

Finally, the court agrees that Defendants' request is properly limited in temporal scope. Defendants request Plaintiff's medical records beginning January 1, 2014. *See* [Doc. 42]. Notably, Plaintiffs attach to their Surreply the medical records Ms. Zubkovskaya claims to have provided Defendants at the start of her treatment. *See* [Doc. 51-1 at 3–8]. While those records are heavily redacted, the court notes that one of those records is dated March 31, 2014, and another is dated March 8, 2014. [*Id.* at 3–4]. Plaintiffs' reference to those 2014 records here indicate to the court that her other medical records related to infertility from that time bear at least some relevance to their Sixth, Seventh, and Eighth claims related to Dr. Gustofson's assessment of Ms. Zubkovskaya's chances to become pregnant—which, according to Dr. Gustofson, was based at least in part on the information and prior medical records that Ms. Zubkovskaya provided to Defendants at the start of her treatment in 2018. *See* [Doc. 49-1].

For the foregoing reasons, Plaintiffs are **ORDERED** to produce medical records from Ms. Maya Zubkovskaya's health care providers from January 1, 2014 to the beginning of their treatment with Defendants on December 11, 2018. *See* [Doc. 41 at ¶ 39]. Such production shall be made no later than **May 13, 2022**.

### 4.    Remaining Issues: Plaintiffs' Privilege Log and Request to Stay this Order

Defendants also argue that Plaintiffs have not identified or described in a privilege log "any documents that are being withheld" based on their assertions of privilege. [Doc. 42 at 5–6].

Pursuant to Rule 26(b)(5),

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> (i) expressly make the claim; and
>
> (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5).   Moreover, in *Alcon,* the Colorado Supreme Court held that a party asserting the physician-patient privilege must provide the party seeking the medical records with a privilege log identifying each of the medical records for which the privilege is claimed.  *Alcon*, 113 P.3d at 742.   The party asserting the privilege must describe each medical record with sufficient detail so that the applicability of the physician-patient privilege can be assessed by the party seeking the medical records and, if necessary, by the trial court. *Id.*; *accord Gordon v. Rice*, No. 13-cv-00514-RBJ-MEH, 2014 WL 903205, at *5 (D. Colo. Mar. 7, 2014).

In their Response, Plaintiffs acknowledge that they have not produced a privilege log, but argue that Defendants already possess "all the information that they need to assess the claim of privilege, and the burden to obtain the records and compile a privilege log would yield no additional information." [Doc. 47 at 13].  Plaintiffs also assert that Defendants have "identifie[d] no prejudice from the absence of a privilege log."  [*Id.*].   However, as Defendants point out, Plaintiffs fail to cite any authority that allows them to assert a categorical objection of physician-patient privilege to all medical records requested by Defendants without producing a privilege log. *See* [Doc. 49 at 8].  The court likewise is unaware of any such authority.[10]  Accordingly, Plaintiffs

---

[10] The court notes that Plaintiffs' position in their Response with respect to providing a privilege log is inconsistent with Plaintiffs' Motion to Compel, wherein they claim that "[D]efendants did not provide a privilege log, nor did they, as Fed. R. Civ. P. 26(b)(5)(A)(ii) requires, 'describe the nature of the documents, communications, or tangible things not produced or disclosed—and do

are **ORDERED** to provide Defendants a privilege log that is compliant with Rule 26(b)(5) no later than **May 13, 2022**.

Finally, Plaintiffs argue that should this court require Ms. Zubkovskaya to provide Defendants "any of her medical records, [P]laintiffs request that this court stay the order to provide plaintiffs time to file an objection pursuant to Rule 72(a)." [Doc. 51 at 9]. Pursuant to Federal Rule of Civil Procedure 72(a), "[a] party may serve and file objections to the order within 14 days after being served with a copy." Indeed, Plaintiffs are aware of this Rule, given their prior filing of an objection pursuant to Rule 72(a) in this action, *see* [Doc. 50, filed February 25, 2022]. Thus, the court finds Plaintiffs' request misplaced. Moreover, to the extent that Plaintiffs are requesting that the court stay its determination pending an Objection, Plaintiffs' request is tantamount to filing a motion within her Surreply, which, as explained above, is not permitted. *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document."). In addition, this court is disinclined to grant such stay. Consistent with these findings, this court respectfully **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Compel [Doc. 42].

## II.    Plaintiffs' Motion to Compel

Plaintiffs seek an order compelling Defendants to produce two sets of documents: (1) "[e]mail correspondence between employees of CCRM, Dr. Gustofson and legal counsel regarding this lawsuit and propounding discovery", which are designated as CCRM_00153–00203, which Defendants have withheld on the basis of attorney-client privilege ("First Set of Documents"); and (2) email correspondence "between employees of CCRM, Copic Claims Manager, MedPro Claims

---

so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.'" [Doc. 43 at 1–2].

Manager and Beazley Claims Manager regarding impending litigation and the claims underlying this lawsuit", which are designated as CCRM_00113–00152, which Defendants have withheld as attorney-client privileged or protected by the work product doctrine ("Second Set of Documents"). *See* [Doc. 43 at 1; Doc. 43-4].

Plaintiffs explain that they served their first set of requests for production on September 14, 2021, and Defendants responded on October 29, 2021. [*Id.*]; *see also* [Doc. 43-1; Doc. 43-2]. Plaintiffs claim that "[D]efendants did not provide a privilege log, nor did they, as Fed. R. Civ. P. 26(b)(5)(A)(ii) requires, 'describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.'" [Doc. 43 at 1–2]. On November 24, 2021, Plaintiffs sent a letter to Defendants to request a meeting and conferral regarding their disputes. [*Id.* at 2]; *see also* [Doc. 46-3]. The meeting eventually occurred on December 23, 2021, and lasted for 90 minutes. [Doc. 43 at 2]. Plaintiffs claim that Defendants agreed during the meeting to provide a privilege log, but declined to provide any of the documents referenced in the privilege log. [*Id.*]. Defendants ultimately provided Plaintiffs a privilege log on February 1, 2022, the day before Plaintiffs filed the instant Motion to Compel. [*Id.*]; *see also* [Doc. 43-4].

Plaintiffs argue that the privilege log produced by Defendants is inadequate as to the First Set of Documents because "the only reference to an attorney [in the privilege log] is the term . . . 'legal counsel'", but the privilege log "provides no insight about the role of the 'legal counsel.'" [Doc. 43 at 5]. Plaintiffs likewise argue that Defendants' privilege log fails to "indicate to whom each message might have been disclosed." [*Id.* at 6]. Specifically, Plaintiffs contend that "Defendants' use of the term 'CCRM' employees' leaves open the possibility that the messages

were handled in a manner that did not reflect confidentiality . . . [o]r perhaps the messages were sent to too many employees to indicate an intent to maintain confidentiality." [*Id.*]. Plaintiffs further assert that Defendants' description of the factual basis for asserting the attorney-client privilege as to the First Set of Documents "is suspect" because (1) "the privilege log does not contain even the basic claim that any CCRM employee or [D]efendant Gustofson sought or received legal advice about *anything* in this e-mail correspondence"; and (2) Defendants claim the email messages "relate to 'this lawsuit and propounding discovery' [but] Plaintiffs filed this lawsuit on June 7, 2021, so six messages, from February 23, 2021, to May 20, 2021, supposedly relate to a lawsuit that did not exist yet." [*Id.*]. Plaintiffs similarly argue that they did not serve their first discovery requests until September 14, 2021, "so the 13 messages prior to that date probably do not refer to discovery, especially the six that precede the filing date of the lawsuit." [*Id.*].

As to the Second Set of Documents, Plaintiffs argue that the privilege log is inadequate because "it does not provide sufficient information to enable plaintiffs to assess the claims of privilege"—specifically, "it does not [ ] state any privilege claims on its face or otherwise clearly show that a privilege applies." [*Id.* at 3]. Therefore, Plaintiffs continue, the attorney-client privilege does not apply to the Second Set of Documents because Defendants "do not represent that any of the authors or recipients are attorneys, let alone that they are providing legal advice." [*Id.* at 5]. Plaintiffs also contend that even if the claims managers are attorneys, the attorney-client privilege does not apply to their actions as claims managers. [*Id.*]. Plaintiffs further argue that Defendants' privilege log fails to provide any information to determine whether the Second Set of Documents is protected under the work product doctrine or whether those documents "were created in the ordinary course of insurance business." [*Id.* at 7].

Plaintiffs further contend that Defendants have acted in "bad faith" by denying Plaintiffs "the ability to evaluate their claims of privilege" and "by providing the privilege log late and refusing a reasonable request for an extension of the filing deadline" for Plaintiffs' Motion to Compel. [*Id.* at 7–8]. Thus, Plaintiffs insist that "this court should deem the privileges waived." [*Id.* at 8]. However, should the court determine that Defendants have not waived their asserted privileges, Plaintiffs "request that this court order [D]efendants to provide the documents to the court for *in camera* review so the court can determine the applicability of any privileges." [*Id.*].

In the Response, Defendants disagree with Plaintiffs, arguing that their privilege log identifies the information required under Rule 26(b)(5). *See* [Doc. 46 at 3]. Defendants also contend that (1) their privilege log provides sufficient detail to demonstrate that the attorney-client privilege or work product doctrine applies to the documents at issue; (2) Plaintiffs have not demonstrated a substantial need for the documents "to prepare their case or an inability to obtain the substantial equivalent by other means"; (3) Defendants' objections "were timely raised and Defendants' privilege log was timely served" which, therefore, precludes a finding that Defendants have waived their privileges; and (4) Plaintiffs' request for *in camera* review of the privileged documents amounts to an improper fishing expedition. *See* [*id.* at 3–9].

## I.      Applicable Law

Because this is a diversity action, Colorado substantive law governs the scope and application of the attorney-client privilege. *See White v. Am. Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990) ("In a civil action based upon a state cause of action, state law controls the determination of privileges."). By contrast, "the work product privilege is governed by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3)." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) (citation and quotation omitted).

Colorado has codified the attorney-client privilege in pertinent part as follows: "[a]n attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment . . ." Colo. Rev. Stat. § 13-90-107(b). The law is clear that the attorney-client privilege inures to the benefit and protection of the client to allow a client to gain counsel, advice, or direction with respect to the client's rights and obligations confidentially. *See Mountain States Tel. & Tel. Co. v. DiFede*, 780 P.2d 533, 541 (Colo. 1989).

The work product doctrine is reflected in Rule 26(b)(3)(A), which generally protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for a party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The party seeking to invoke the attorney-client privilege or the work product doctrine bears the burden of establishing that it attaches.

Neither the attorney-client privilege nor the work product doctrine is absolute as either may be waived. The burden of proving such waiver rests upon the party seeking to overcome the privilege. *DiFede*, 780 P.2d at 542; *accord B.H. ex rel. Holder v. Gold Fields Mining Corp.*, 239 F.R.D. 652, 655 (N.D. Okla. 2005) ("[T]he majority view is that the party claiming waiver has the burden of proof on that issue."). A waiver of the attorney-client privilege or work product doctrine may be either express or implied. A waiver may be express when a party affirmatively consents to disclosure of the information. *See, e.g.*, *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (explaining that a client may waive the attorney-client privilege by disclosing privileged communications to a third-party; noting, "[a]ny voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." (citation and internal quotations omitted)); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 668

(10th Cir. 2006) ("The work-product privilege may be waived by the voluntary release of materials otherwise protected by it." (citation and quotation omitted)).  Waiver may also be implied through conduct.  *See, e.g.*, *People v. Madera*, 112 P.3d 688, 691 (Colo. 2005) ("Courts have found implied waiver of the attorney-client privilege when a defendant places the allegedly privileged communication at issue in the litigation, because 'any other rule would enable the client to use as a sword the protection which is awarded him as a shield.'" (citations omitted)).

Unlike the attorney-client privilege, work product immunity is not automatically waived by any disclosure to a third party.  *See In re Sealed Case*, 676 F.2d 793, 802–10 (D.D.C. 1982).  The general standard for determining whether protected work product must be disclosed is where (1) the materials are otherwise discoverable under Rule 26(b)(1); and (2) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.  Fed. R. Civ. P. 26(b)(3).  If disclosure of work product is ordered by the court, the court must protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.  Fed. R. Civ. P. 26(b)(3)(B).

The party withholding information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege.  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Midland Bancor, Inc.*, 159 F.R.D. 562, 567 (D. Kan. 1994); *McCoo v. Denny's Inc.*, 192 F.R.D. 675, 683 (D. Kan. 2000) (observing that the party invoking a privilege must establish all elements of the doctrine through an evidentiary showing based on competent evidence; and "the burden cannot be discharged by mere conclusory or ipse dixit assertions"); *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) ("[A] mere allegation that the work product doctrine applies is insufficient.").

Where a party withholds otherwise relevant information by claiming it is privileged and lists such documents on a privilege log, that party is required to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). The rule has been interpreted in this District to require the following categories of information for a satisfactory privilege log:

(1) identification of the author or origin of the document;

(2) a description of any documents or materials attached to the document;

(3) identification of all recipients of the document, including addresses and persons or entities receiving copies;

(4) the date of the origin of the document; and

(5) a description of the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege.

*WildEarth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1266 (D. Colo. 2010). "Privilege log entries may be deemed insufficient where they are missing 'vital information' regarding whether the sender or recipient is an attorney, or a descriptive indication as to why the document fits the elements of the privilege—for example, that it was not shared with a larger group and therefore not confidential." *Id.* (citation omitted).

## II.   Application

The court will begin by addressing the sufficiency of Defendants' privilege log and then turn to the Parties' arguments regarding whether Defendants have waived their privileges and whether an *in camera* review is warranted at this stage in the proceedings.

### A.   Defendants' Privilege Log

Upon examining Defendants' privilege log, *see* [Doc. 43-4], the court finds that it is insufficient. The court will address the insufficiency as to each set of documents in turn.

*First Set of Documents.*   Defendants describe the contents of the First Set of Documents as "[e]mail correspondence between employees of CCRM, Dr. Gustofson and legal counsel regarding this lawsuit and propounding discovery", and cite to approximately thirty-nine pages of correspondence dated from August 4, 2020, to August 22, 2021.   [Doc. 43-4 at 2].   In their Response, Defendants explain that "[o]n February 15, 2020, Plaintiffs served Defendants a written demand for compensation relating to the events form[ing] the basis of this lawsuit."   [Doc. 46 at 4 (citing [Doc. 41 at ¶ 84])].   "Upon receipt of Plaintiffs' demand letter," Defendants continue, they "sought legal advice for the allegations contained therein and in forming an appropriate response." [*Id.*].   Defendants argue that, therefore, their "confidential communications relating to the legal matter for which Defendants sought legal advice is not restricted to the filing of a complaint nor are discovery efforts limited to formal written discovery requests."   [*Id.*].   Defendants further argue that "[t]he description of these documents in [their] privilege log provides sufficient detail to establish the attorney-client privilege applies and these documents are not subject to production." [*Id.*].

However, the privilege log does not identify any of the "employees of CCRM" with respect to the First Set of Documents, whether by name or job title.   *See* [Doc. 46-1 at 2].   And although Defendants' privilege log mentions "legal counsel", Defendants do not specify whether such counsel is, in fact, an attorney, nor does it descriptively indicate whether the CCRM employees or Dr. Gustofson sought or received legal advice in those emails.   *See United States v. Johnston,* 146 F.3d 785, 794 (10th Cir. 1998) (explaining that to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client); *see also Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F.Supp.2d 252, 267 (D.D.C. 2004) (explaining that, in order to properly invoke the attorney-client privilege, a party must show that

the document "(1) involves 'confidential communications between an attorney and [his or her] client' and (2) relates to a 'legal matter for which the client has sought professional advice[ ]'"). Moreover, the privilege log does not identify the sender or recipient of *each* email, let alone whether an attorney's advice was the subject of each such email.  *See* [Doc. 46-1].

In addition, the privilege log does not sufficiently explain what "propounding discovery" means.  *See* [Doc. 46-1 at 2].  As Plaintiffs point out, the original Complaint was not filed until June 7, 2021 and Plaintiffs did not serve their first set of discovery requests until September 14, 2021, *see* [Doc. 43 at 6]; therefore, it is unclear how the emails preceding those dates "regarding this lawsuit and propounding discovery", respectively, could have existed.

Accordingly, given Defendants' failure to sufficiently identify the "CCRM employees" or "legal counsel" in the privilege log (including their respective participation in the emails), Defendants' arguments related to the dates of the emails—specifically, that their "confidential communications relating to the legal matter for which [they] sought legal advice is not restricted to the filing of a complaint nor are discovery efforts limited to formal written discovery requests"—is unpersuasive here.  *See* [Doc. 46 at 4].  In sum, the court finds that Defendants' privilege log does not sufficiently explain the basis for the attorney-client privilege with respect to the First Set of Documents.

***Second Set of Documents.***  Defendants describe the contents of the Second Set of Documents as "[e]mail correspondence between employees of CCRM, Copic Claims Manager, MedPro Claims Manager and Beazley Claims Manager regarding impending litigation and the claims underlying this lawsuit", and cite to approximately fifty pages of correspondence dated from February 23, 2021, to October 13, 2021.  [Doc. 43-4 at 1–2].  Defendants argue that Copic, MedPro and Beazley are "insurance companies which provide insurance coverage to one or more

Defendants related to the claims in this lawsuit", and those communications are protected by the attorney-client privilege because "CCRM employees and the identified claims managers gathered information on behalf of Defendants relating to the legal services for which legal counsel was retained". [*Id.* at 4]. Defendants also insist that such privilege "applies to communications with all CCRM employees irrespective of the number of CCRM employees involved in such communications" and, "[t]herefore, the description of these documents in Defendants' privilege log likewise establish that the attorney-client privilege applies, and these documents are not subject to production." [*Id.* at 4–5].

However, like the First Set of Documents, there is no indication that the emails in the Second Set of Documents involved an attorney at all or the rendering of legal advice, or what is meant by "impending litigation" or "claims underlying this lawsuit". *See WildEarth Guardians*, 713 F. Supp. 2d at 1266. Defendants merely reference their insurance claims managers and "employees of CCRM[.]" [Doc. 46-1 at 2]. Moreover, the privilege log does not identify any of the "employees of CCRM", *see* [Doc. 46-1 at 1–2], whether by name or job title, nor does it identify the number of CCRM employees. And, although Defendants assert "the attorney-client privilege applies to communications with all CCRM employees irrespective of the number of CCRM employees involved in such communications", Defendants still fail to provide any information regarding any of the "CCRM employees involved in such communications" to allow this court to determine whether the asserted privilege indeed applies. *See* [Doc. 46 at 4]. Accordingly, the court finds that Defendants' privilege log does not sufficiently explain the basis for the attorney-client privilege with respect to the Second Set of Documents.

In addition, Defendants argue their privilege log "properly identifies the participants in and content of communications which trigger application of the work product doctrine" as to the

Second Set of Documents.  [*Id.* at 5].  Specifically, Defendants reference Plaintiffs' demand letter on February 15, 2020, before the Complaint was filed.  *See* [*id.* (citing [Doc. 41 at ¶ 84])].  Defendants argue that, "[i]n light of the factual situation at the time, it can fairly be said that the privileged email correspondence was prepared or obtained because of the prospect of litigation following Defendants' denial of payment."  [*Id.* at 6].  Defendants further argue that even if "such communications were also created for a business purpose, the work product protection continues to apply when the company understands its decision-making process will likely result in litigation."  [*Id.*].

As with Defendants' assertions of the attorney-client privilege, the court also finds Defendants' privilege log insufficient with respect to Defendants' claims of the work product privilege for the same reasons—namely, it fails to provide enough information for this court to determine whether the privilege indeed applies.  Moreover, in support of their work product arguments, Defendants cite to *Martensen v. Koch*, 301 F.R.D. 562, 579 (D. Colo. 2014).  [*Id.* at 5–6].  However, *Martensen* is distinguishable.  That case involved the crime-fraud exception to attorney-client privilege; and, with respect to the work product doctrine, the court determined that the documents at issue "were prepared in anticipat[ion] of litigation that was reasonably foreseeable and, therefore, constitute[d] protected work product" based on the defendant's deposition testimony which "suggest[ed] that [the documents] are integrally related to the affirmative defense that [the plaintiff] was 'self-dealing and participating in a fraudulent scheme . . .' and the affirmative defense that [the] [d]efendant was 'legally justified and/or privileged' in detaining" the plaintiff.  *Martensen*, 301 F.R.D. at 573, 579.

Here, Defendants do not claim the crime-fraud exception is relevant to their privilege assertions, nor do they reference any deposition testimony or their affirmative defenses to

Plaintiffs' claims. Instead, they argue that "it can fairly be said that the privileged email correspondence was prepare or obtained because of the prospect of litigation following Defendants' denial of payment" in response to Plaintiffs' demand letter on February 15, 2020. [Doc. 46 at 5–6]. Further, even if Defendants' arguments had merit, that would not absolve them of their obligation to provide a privilege log that sufficiently explains their bases for asserting the privileges at issue. *See WildEarth Guardians*, 713 F. Supp. 2d at 1266. Thus, the court finds that Defendants' privilege log does not sufficiently explain the basis for the work-product doctrine with respect to the Second Set of Documents.

### B.   Plaintiffs' Requests for Relief

As mentioned, Plaintiffs ultimately ask this court to (1) deem Defendants' privileges waived; or (2) in the alternative, order Defendants to provide the documents to the court for *in camera* review to determine the applicability of the privileges asserted. [Doc. 43 at 8]. The court declines both requests for the reasons explained below.

First, as explained above, Defendants' entries are deficient in that the court cannot make a meaningful examination and determination regarding the privilege designations on the basis of the scant information Defendants have provided in the privilege log. However, the court finds that declaring a waiver of privilege as an appropriate sanction for an inadequate privilege log is a disproportionate remedy. *See Pandeosingh v. Am. Med. Response, Inc.*, No. 14-cv-01792-PAB-KMT, 2014 WL 5488415, at *2 (D. Colo. Oct. 30, 2014) (explaining that "[t]he attorney client privilege . . . is sacrosanct" and "declaring a waiver of privilege as an appropriate sanction for an inadequate privilege log is too harsh"). Rather, Defendants should be allowed to cure the deficiencies in their privilege log if possible and preserve the attorney-client privilege to the extent it is truly applicable. Accordingly, to allow meaningful consideration of Defendants' assertions of privilege, Defendants shall supplement their privilege log to identify for each document

withheld on the basis of the attorney-client privilege or the work product doctrine: "(1) the author or origin of the document; (2) any documents or materials attached to the document; (3) all recipients of the document, including addresses and persons or entities receiving copies; (4) the date of the origin of the document; (5) and a description of the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege." *WildEarth Guardians*, 713 F. Supp. 2d at 1266–67.[11]  Such supplementation must be made to Plaintiffs no later than **May 13, 2022**.

Although Defendants argue that much of this information has already been communicated, *see, e.g.*, [Doc. 46 at 3], I find that they have not sufficiently described the contents of the emails at issue to allow the court to meaningfully evaluate their assertion of the attorney-client privilege and/or work product doctrine.  In developing this privilege log, Defendants should clearly articulate why these communications are subject to protection under the applicable privilege(s). *See WildEarth Guardians*, 713 F. Supp. 2d at 1267.

Second, the court declines to order Defendants to submit the subject documents for *in camera* review at this time.  "The decision whether to review [documents] *in camera* is within the sound discretion of the trial court."  *Mounger v. Goodyear Tire & Rubber Co.,* No. 99-2230-JWL, 2000 WL 33712198, at *1 (D. Kan. Sept. 22, 2000) (quoting *In re Grand Jury Subpoenas,* 906 F.2d 1485, 1493 (10th Cir.1990)).  "Such review is not, however, to be routinely undertaken . . . as a substitute for a party's submission of an adequate record in support of its privilege claims."

---

[11] Moreover, with respect to Defendants' assertion of work product privilege, as Defendants point out, Plaintiffs fail to show they have a substantial need for the documents identified in Defendants' privilege log.  *See* [Doc. 46 at 2]; *see also* Fed. R. Civ. P. 26(b)(3).  Instead, Plaintiffs argue that they "specifically want this information to evaluate which persons, and potential witnesses, have knowledge of the claims in this case."  [Doc. 43 at 6].  Notably, Plaintiffs provide no further support for this argument, and they do not claim that Defendants have previously withheld the identities of relevant witnesses.  *See* [*id.*].

*Id.* at *2  (quoting *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 475 (S.D.N.Y. 1993)); *see also Kirzhner v. Silverstein*, 870 F. Supp.2d 1145, 1153 (D. Colo. 2012) ("The rest of defendants' argument amounts to counsel's implied suggestion that plaintiff's counsel's determination of what portions of documents should be redacted based upon a claim of privilege cannot be trusted, and therefore, that the magistrate judge should have reviewed the redactions *in camera*. A mere suspicion is not enough, or judges would have to, if asked, examine *in camera* every document ever withheld on privilege grounds.").  As explained above, the court finds that Defendants should be allowed an opportunity to submit a more adequate record in support of their privilege claims; and allowing such supplementation also advances judicial economy to allow this court to focus upon discovery disputes that have been fully vetted by the Parties.  To the extent that Plaintiffs have continued concerns regarding the assertion of any privilege by Defendants, they may renew their request for *in camera* review at that time, after a robust meet and confer.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)    Defendants' Motion to Compel [Doc. 42] is **GRANTED IN PART AND DENIED IN PART**;

(2)    No later than **May 13, 2022**, Plaintiffs are **ORDERED** to produce medical records from Ms. Maya Zubkovskaya's health care providers from January 1, 2014 to the beginning of their treatment with Defendants on December 11, 2018.

(3)    No later than **May 13, 2022**, Plaintiffs are **ORDERED** to provide Defendants a privilege log that is compliant with Rule 26(b)(5), as set forth in this opinion; and

(4)    Plaintiff's Motion to Compel [Doc. 43] is **DENIED without prejudice**;

(5)     No later than **May 13, 2022**, Defendants shall supplement their privilege log to identify for each document withheld on the basis of the attorney-client privilege or work product doctrine: (a) the author or origin of the document; (b) any documents or materials attached to the document; (c) all recipients of the document, including addresses and persons or entities receiving copies; (d) the date of the origin of the document; (e) and a description of the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege.

DATED:  April 29, 2022

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge